Received Electronically

July 8, 2024

United States Court of Appeals
For the First Circuit

No. _____

# In the United States Court of Appeals for the First Circuit

---

IN RE VERAX BIOMEDICAL INC.

*Petitioners.*

---

Petition for Review of Order Granting Partial Motion to Dismiss from the United States District Court for the District of Massachusetts
No. 1:23-cv-10335-PBS
Hon. Patti B. Saris

---

## VERAX'S PETITION FOR INTERLOCUTORY REVIEW

---

SCOTT ABELES, Bar No. 1213004
BENJAMIN STOLL, Bar No. 1212466
**CARLTON FIELDS, P.A.**
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007
Telephone: (202) 965-8189
Facsimile: (202) 965-8104

*Counsel for Petitioner*

# RULE 26.1 DISCLOSURE STATEMENT

_____

Verax Biomedical Inc. does not have a parent corporation. No publicly held corporation owns 10% or more of its stock.

# <u>TABLE OF CONTENTS</u>

*Page*

RULE 26.1 DISCLOSURE STATEMENT ............................................................. i

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ................................................................................................... 1

FACTS NECESSARY TO UNDERSTAND THE QUESTION
PRESENTED ......................................................................................................... 2

QUESTION PRESENTED .................................................................................... 4

RELIEF SOUGHT ................................................................................................. 5

REASONS WHY THE PETITION SHOULD BE GRANTED ............................ 5

I.      THE PETITION SATISFIES SECTION 1292(b)'S CRITERIA ................. 6

        A.      The Question Presented Is a Controlling Issue of Law ...................... 6

        B.      There Are Substantial Grounds for a Difference of Opinion
                Regarding the Certified Order ............................................................ 8

                1.      There Are Substantial Grounds for Disagreement with the
                        Legal Principle on which the Order Rests ............................... 8

                2.      The District Court Relied on Dicta for Its Core Legal
                        Principle .................................................................................11

                3.      There Are Substantial Grounds for Disagreement with the
                        District Court's Application of Flamingo ................................13

        C.      Interlocutory Review Would Likely Advance the Ultimate
                Disposition of this Case ................................................................... 18

# TABLE OF CONTENTS
(continued)

*Page*

II.    THIS CASE IS EXCEPTIONAL ..................................................................20

CERTIFICATE OF COMPLIANCE.......................................................................22

CERTIFICATE OF SERVICE.................................................................................23

# TABLE OF AUTHORITIES

*Page*

## Cases

*Agency for International Development v. Alliance for Open Society International, Inc.*,
140 S. Ct. 2082 (2020) ..................................................................14

*Amphastar Pharmaceuticals, Inc. v. Momenta Pharmaceuticals, Inc.*,
313 F. Supp. 3d 366 (D. Mass. 2018) .........................................18

*Arcam Pharmaceutical Corp. v. Faria*,
513 F.3d 1 (1st Cir. 2007) ............................................................16

*City of Loudon, Tennessee v. Tennessee Valley Authority*,
585 F. Supp. 83 (E.D. Tenn.), *aff'd*, 754 F.2d 372 (6th Cir. 1984) ........................................................................................15

*Dow Jones & Co. v. United States Postal Service*,
110 F.3d 80 (D.C. Cir. 1997) .......................................................10

*Holliday v. Xerox Corp.*,
555 F. Supp. 51 (E.D. Mich. 1982), *aff'd*, 732 F.2d 548 (6th Cir. 1984) ........................................................................................19

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ......................................................................17

*Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta*,
713 F.2d 1221 (6th Cir. 1983) .............................................14, 15

*Katz v. Carte Blanche Corp.*,
496 F.2d 747 (3d Cir.1974) ..........................................................18

*Lane v. First National Bank of Boston*,
871 F.2d 166 (1st Cir. 1989) ........................................................19

*Lopez-Garcia v. Corporacion del Fondo del Seguro del Estado*,
No. 16-2068 (1st Cir. Mar. 2, 2017) ..............................................6

# TABLE OF AUTHORITIES
(continued)

*Page*

*Louisiana State Conference of NAACP v. Louisiana*,
   495 F. Supp. 3d 400 (M.D. La. 2020) .......................................................20

*McCarthy v. Middle Tennessee Electric Membership Corp.*,
   466 F.3d 399 (6th Cir. 2006)........................................................... 14, 15, 16

*McGillicuddy v. Clements*,
   746 F.2d 76 (1st Cir. 1984) ......................................................................6, 7

*Milbert v. Bison Laboratories, Inc.*,
   260 F.2d 431 (3d Cir. 1958)......................................................................18

*In re Mushroom Direct Purchaser Antitrust Litigation*,
   54 F. Supp. 3d 382 (E.D. Pa. 2014).............................................................6

*Perez v. Preston*,
   2016 WL 10637099 (N.D. Ga. Nov. 22, 2016), *certified
   question answered sub nom. Secretary, U.S. Department of
   Labor v. Preston*, 873 F.3d 877 (11th Cir. 2017)........................................19

*Pollack v. Laidlaw Holdings, Inc.*,
   993 WL 254932 (S.D.N.Y. June 25, 1993) .................................................19

*Rivera-Nazario v. Corporacion del Fondo del Seguro del Estado*,
   2016 WL 11815752 (D.P.R. July 29, 2016)............................................6, 19

*In re San Juan Dupont Plaza Hotel Fire Litigation*,
   859 F.2d 1007 (1st Cir. 1988) .............................................................5, 6, 7

*Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*,
   249 F. Supp. 2d 463 (M.D. Pa. 2003), *aff'd in part, vacated in
   part, remanded*, 401 F.3d 123 (3d Cir. 2005)..............................................7

*Sea-Land Services, Inc. v. Alaska Railroad*,
   659 F.2d 243 (D.C. Cir. 1981) ...................................................................12

# TABLE OF AUTHORITIES
(continued)

*Page*

*SolarCity Corp. v. Salt River Project Agricultural Improvement*,
    2015 WL 9268212 (D. Ariz. Dec. 21, 2015) ..................................................6

*The Northeast Ohio Coalition for the Homeless v. Husted*,
    831 F.3d 686 (6th Cir. 2016)..........................................................................16

*United States v. Flamingo Industries*,
    540 U.S. 736 (2004)..............................................1, 2, 4, 9, 10, 11, 12, 14

*United States v. Wells Fargo & Co.*,
    943 F.3d 588 (2d Cir. 2019).........................................................................15

*White v. Nix*,
    43 F.3d 374 (8th Cir. 1994)........................................................................18

## Statutes

5 U.S.C. § 105 .........................................................................................10, 17

12 U.S.C § 282 ...............................................................................................15

12 U.S.C § 289 ...............................................................................................15

12 U.S.C. § 290 ..............................................................................................15

12 U.S.C § 321 ...............................................................................................15

15 U.S.C. § 7 ....................................................................................................9

16 U.S.C. § 831 ........................................................................................15, 16

28 U.S.C. § 1292.....................................................................................2, 5, 20

36 U.S.C. § 300102..........................................................................................3

36 U.S.C. § 300104.......................................................................................3, 4

# TABLE OF AUTHORITIES

(continued)

*Page*

**Other Authorities**

Charles Alan Wright, et al., 16 Federal Practice and Procedure (3d
ed.)................................................................................5, 7, 19

U.S. Department of Justice, Antitrust Division, Statements of Interest,
https://www.justice.gov/atr/statements-interest...........................20

## **INTRODUCTION**

Petitioner Verax Biomedical Inc. filed claims under Section 1 and 2 of the Sherman Act, and under state law, against the American Red Cross, based on its actions in two markets (i) blood platelets, used by health care providers performing transfusions; and (ii) bacterial mitigation services, or the means used to ensure the safety of blood platelets. *See* Case No. 1:23-cv-10335, ECF 1. Verax alleged the Red Cross leveraged its market power in blood platelets to foreclose competition in the mitigation services market, where Verax competes with the Red Cross. *Id.*

The Red Cross moved to dismiss on grounds including that, because the Sherman Act does not apply to the United States, it does not apply to the Red Cross either, as Congress has recognized the Red Cross as a federal instrumentality. ECF 19 at 15-18. The United States Department of Justice filed a Statement of Interest in response to the Red Cross' assertion. ECF 34 (attached as Ex. 3). In it, DOJ stated that the Red Cross' "argument that it is not subject to the Sherman Act rests on a misreading of the law," and "urge[d] the Court to reject this argument." *Id.* at 2. In short, the United States, along with Verax, explained that under the Supreme Court's controlling decision in *United States v. Flamingo Industries*, 540 U.S. 736, 743 (2004), the Red Cross, as a private, nonprofit corporation free from federal influence, supervision, or control, is a separate antitrust person from the United States, and is subject to the Sherman Act.

The district court granted the Red Cross' motion on the ground that it is a federal instrumentality. ECF 42 ("MTD Order," attached as Ex. 1) at 11-19. It reasoned that "one of th[e] 'rights' of an instrumentality of the United States is immunity from antitrust suit," such that as "an instrumentality of the United States, [the Red Cross] is not a 'person' separate from the United States." *Id.* at 17, 19. It has described the question presented as "very difficult" and a "jump ball."

Verax moved to certify the order under 28 U.S.C. § 1292(b). ECF 52, 53. The district court found that Section 1292(b)'s factors were met, including that "[r]easonable minds can (and do) differ regarding [the Red Cross'] antitrust personhood." ECF 58 ("Cert. Order," attached as Ex. 2) at 6 . This Petition followed.

## FACTS NECESSARY TO UNDERSTAND THE QUESTION PRESENTED

The question presented – whether the Red Cross is a "person" subject to the Sherman Act – is narrow, so the facts necessary to understand it are abbreviated. A federal entity is not a "person" under the Sherman Act if in "form and function" it shares an identity with the United States.[1] This section, accordingly, focusses on the Red Cross' form and function.

Regarding form, the Red Cross "is a federally chartered nonprofit corporation." *Id.* at 5. It is organized as a 501(c)(3) and describes itself as a charity.

---

[1] *See Flamingo*,  540 U.S. at 748 ("The Postal Service, in both form and function, is not a separate antitrust person from the United States").

Ex. 3 at 3-4. Its corporate form and tax designation make the Red Cross legally separate from any other entity, and it is required to conduct its affairs independent from government control. *See* 36 U.S.C. § 300102(3). In 2007, Congress added language to its charter, describing it as "a Federally chartered instrumentality of the United States." MTD Order at 6. It has "the rights and obligations consistent with that status." *Id.* It also has the right to "sue and be sued." *Id.*

The Red Cross is not part of the executive branch of the federal government. Ex. 3 at 4-10. The President does not appoint any of its board members. *See* 36 U.S.C. § 300104(a)(3)(B). Its leaders are not subject to removal by the President or the head of any executive department or agency. It is not owned, controlled, or funded by the federal government. Ex. 3 at 4-10. Its form, in short, resembles that of a typical, private non-private corporation and not, for example, an independent establishment like the Postal Service, or independent agency like the FTC.

Regarding function, most of the Red Cross' income comes from activities in the private market, selling blood platelets and services to hospitals. Ex. 3 at 13 n.10. The Red Cross is, by far, the largest supplier of blood platelets in the nation. MTD Order at 1, 6. By statute, it also performs unrelated work for the federal government, "provid[ing] volunteer aid in time of war to the sick and wounded of the Armed Forces," 36 U.S.C. § 300102(1), and "carry[ing] out a system of national and international relief in time of peace." *Id.* § 300102(4); MTD Order at 5-6.

The Red Cross functions free of federal influence, supervision, or control. *See* 36 U.S.C § § 300104(a)(1); 300109; Ex. 3 at 4-10. No government board, agency, or official supervises its day-to-day affairs. *Id.* Unlike, for example, Federal Reserve banks, the Red Cross has no special limits on its private-market conduct. Contracts with the Red Cross are not government contracts, subject to procurement regulations or bid protests.  If the Red Cross enters into agreements in restraint of trade, there is no supervising federal official to lobby, bring before Congress, or vote from office.

The Red Cross also sets its prices with impunity, in contrast to, for example, the Postal Service, which has a monopoly over the delivery of U.S. mail but is subject to rate regulation. *See Flamingo*, 540 U.S. at 740-41. If the Red Cross charges supracompetitive prices commensurate with its market power, consumers cannot turn to a regulator, member of Congress, or other public official.[2]

Congress has not endowed the Red Cross with any traditional powers of government. MTD Order at 18; Ex. 3 at 12-13. It has no investigative, enforcement, or rulemaking powers. Its powers resemble those of a private actor.

## **QUESTION PRESENTED**

The Red Cross is a private, 501(c)(3) corporation that by law must operate independent of the federal government, and free of its control. The question

---

[2] Unlike typical government agencies, the Red Cross is not subject to FOIA or other statutes that apply to federal agencies, establishments, and officials. Ex. 3 at 9-10.

presented is whether for purposes of the antitrust laws the Red Cross is a "person" separate from the United States itself. *See* Cert. Order at 3.

## RELIEF SOUGHT

Pursuant to Fed. R. App. 5, Verax respectfully requests that this Court grant this Petition and allow an interlocutory appeal of the certified question.

## REASONS WHY THE PETITION SHOULD BE GRANTED

The Court has discretion to hear an interlocutory appeal of an order a district court finds meets Section 1292(b)'s factors. Those factors are met when an order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1010 n.1 (1st Cir. 1988) (citing 28 U.S.C. § 1292(b)). Section 1292(b)'s factors "should be treated as guiding criteria rather than jurisdictional requisites;" are meant to inject "flexibility into the technical rules of appellate jurisdiction;" and should be viewed "as the statutory language equivalent of a direction to consider the probable gains and losses of immediate appeal." Charles Alan Wright, et al., *Federal Practice and Procedure* § 3930 (3d ed.).

To be sure, this Court has suggested that successful motions of this type are "few and far between," while noting the device is appropriate "where the proposed intermediate appeal presents one or more difficult and pivotal questions of law not

settled by controlling authority." *In re San Juan*, 859 F.2d at 1010 n.1 (quoting *McGillicuddy v. Clements*, 746 F.2d 76, 76 n.1 (1st Cir. 1984)).That is the case here.

## I.    THE PETITION SATISFIES SECTION 1292(b)'S CRITERIA

### A.    *The Question Presented Is a Controlling Issue of Law*

The district court found that "whether ARC is a separate 'person' from the United States under the Sherman Act is a controlling question of law." Cert. Order at 4. A question is controlling if reversal would "significantly alter[]" the case's scope. *Id.* (citing cases). Here, the Sherman Act claims are the crux of Verax's suit; "[r]eviving" them would "'significantly alter[]' the scope of discovery, trial, and Verax's possible recovery." *Id.*

Courts have often found that whether a defendant is subject to antitrust suit is a controlling question. *E.g., Rivera-Nazario v. Corporacion del Fondo del Seguro del Estado*, 2016 WL 11815752, at *3 (D.P.R. July 29, 2016) (whether "Defendants are entitled to *Parker* immunity" is a "controlling question"); *In re Mushroom Direct Purchaser Antitrust Litig.*, 54 F. Supp. 3d 382, 394–95 (E.D. Pa. 2014) (same, as to Capper–Volstead or *Copperweld* immunity); *SolarCity Corp. v. Salt River Project Agric. Improvement*, 2015 WL 9268212, at *2 (D. Ariz. Dec. 21, 2015).[3]

The Red Cross has argued that a question is controlling only if it "terminates"

---

[3] In *Rivera-Nazario*, the plaintiff did not obtain review of the certified question in this Court because it missed the deadline. *See Lopez-Garcia v. Corporacion del Fondo del Seguro del Estado*, No. 16-2068 (1st Cir. Mar. 2, 2017).

a case, or "dramatically reduces" its scope. ECF 54 at 9. But it is Section 1292(b)'s *third* factor, not its first, that weighs whether early resolution of a controlling question will materially advance a case.

This Court's leading cases are more flexible. They deploy terms like "difficult" and "pivotal" as synonyms for "controlling." *See In re San Juan*, 859 F.2d at 1010 n.1; *McGillicuddy*, 746 F.2d at 76 n.1. Thus in *In re San Juan*, for example, this Court reviewed an order regulating deposition practice and work product. *See* 859 F.2d at 1010 n.1. Resolution of that question could not terminate or narrow a case, but this Court found the issue "novel and important" and worthy of review.

The Red Cross also argued that whether the party seeking review is a plaintiff or defendant was key to whether the issue presented is controlling. ECF 54 at 10-11 & n.2. The leading civil procedure treatise does not agree:

> There is no doubt that a question is 'controlling' if its incorrect disposition would require reversal of a final judgment, either for *further proceedings* or for a dismissal that might have been ordered without the ensuing district-court proceedings.

Charles Alan Wright, et al., 16 *Federal Practice and Procedure Jurisdiction* § 3930 (3d ed.). Case law is consistent. *See e.g., Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 249 F. Supp. 2d 463, 471 (M.D. Pa. 2003) (order applying Noerr-Pennington immunity doctrine in defendants' favor certified for review, where it "severely limited" plaintiff's remaining claims), *aff'd in part, vacated in part,*

*remanded*, 401 F.3d 123 (3d Cir. 2005).

The certified question presents a controlling issue of law.

**B.    There Are Substantial Grounds for a Difference of Opinion Regarding the Certified Order**

Few courts have considered the personhood status of entities under the antitrust laws, perhaps owing to the fact that federal agencies and instrumentalities do not frequently operate multi-billion businesses in competition with private actors, free from price regulation or other controls. That said, no court has ever found an entity free from federal supervision or control is beyond the Sherman Act's scope.

The district court broke new ground by applying the following legal principle, which doubles as its holding: "Because ARC is an instrumentality of the United States, it is not a 'person' separate from the United States under the Sherman Act." MTD Order at 19. The only apparent exception arises if Congress "explicitly" directs to the contrary in the entity's charter. *Id.* at 17.

In this case of first impression in this circuit, there are substantial grounds to dispute this principle and the court's application of it. It is not found in the Supreme Court's controlling opinion, *Flamingo*, and is not consistent with *Flamingo's* approach. At least one other court of appeals disagrees with the district court. And the few other cases in this area, read properly, do not support it.

1.    *There Are Substantial Grounds for Disagreement with the Legal Principle on which the Order Rests*

-8-

The Sherman Act imposes liability on any "person." It provides that "'person' ... shall be deemed to include corporations and associations existing under … the laws of either the United States [or of States or foreign governments]." 15 U.S.C. § 7. The United States is not a person under the Act. *Flamingo*, 540 U.S. at 744. That begs the question as to whether federal agencies, establishments, instrumentalities, etc., are or are not "persons." That is where *Flamingo's* two-stage test comes in.

Under it, courts first evaluate "whether there is a waiver of sovereign immunity" in the entity's charter through a "sue-and-be-sued clause." *Flamingo*, 540 U.S. at 743. That is, to be eligible for the test, the entity must be one for which sovereign immunity *could* be waived; *i.e.,* a government-affiliated entity of some sort. If there is a waiver, the test proceeds to step two. *Id.* But if instrumentality status were enough by itself to show an entity is outside the Sherman Act's scope, as the district court found, there would be no need to consider whether sovereign immunity was waived. The entity would not be subject to an antitrust claim either way.

Nor would there be need for stage two of *Flamingo's* test. Under step two, courts evaluate the entity and its governing statutes to determine if "the substantive prohibitions of the Sherman Act apply to" it. *Id.* at 744. That question requires analysis of whether Congress intended that the entity "be treated under the antitrust laws as part of the Government of the United States," or as "a market participant separate from it." *Id.* at 747. It is part of the United States if "in both form and

function, [it] is not a separate antitrust person." *Id.* at 748. That is, an instrumentality can be "part of" the government or "separate" from it – it is not *automatically* part of the government, as the district court found. MTD Order at 19.

*Flamingo's* analysis makes this plain. The Postal Service is, at least colloquially, the nation's ultimate federal instrumentality, as all it does is the government's work, all day, every day. *See Dow Jones & Co. v. U.S. Postal Serv.*, 110 F.3d 80, 83 (D.C. Cir. 1997). *Flamingo* classified USPS more accurately, as an "establishment" of the United States, *see* 540 U.S. at 746, or akin to an "agency." 5 U.S.C. § 105. But whether classified as an agency or instrumentality, the point is the same: *Flamingo* shows personhood does not rest on federal status alone. If it did, after confirming USPS's classification as an establishment in the executive branch, the analysis would have drawn to a close, without regard to whether USPS was organized as a corporation, or its function. But it didn't.

*Flamingo* analyzes USPS's form at length, emphasizing its placement in "the executive branch," overseen by nine governors appointed by the President, and two selected by those nine. *Id.* at 740. Its rates are supervised by another federal agency, the Postal Rate Commission, which must consider the impact on consumers and competitors when recommending prices. *Id.* at 740-41.

*Flamingo* then evaluated how USPS functions. USPS is vested with a monopoly over mail delivery and powers to enforce that monopoly, including the

power to search and seize mail. *Id.* at 741. It is obligated "to provide universal service." *Id.* It has "the power of eminent domain" and "to make postal regulations." *Id.* These are "significant governmental powers, consistent with its status as an independent establishment of the Executive Branch." *Id.*

Based on its "form and function," the Court found USPS did not have an identity separate from the United States. *Id.* at 748. The most important factor was USPS's placement in the executive branch, under federal control. *See id.* at 746. Notwithstanding that placement, it added, if USPS were "a federal corporation, the Court would have to ask whether the Sherman Act's definition extends to the federal entity under this part of the definitional text." 540 U.S. at 737. That its "goals, obligations, and powers" were "different" from "private corporations" sealed the analysis. It has vast executive powers, but lacks "the prototypical means of engaging in anti-competitive behavior: the power to set prices." *Id.* Its "public characteristics and responsibilities indicate it should be treated under the antitrust laws as part of the Government of the United States, not a market participant separate from it." *Id.*

If all that mattered to the analysis was that USPS was a federal establishment, then nearly all of the Supreme Court's analysis of its form and function would have been unnecessary. Such a reading of *Flamingo* is untenable.

      2.    *The District Court Relied on Dicta for Its Core Legal Principle*

In holding that federal instrumentalities are not subject to the Sherman Act,

the district court relied on *dicta* in *Sea-Land Services, Inc. v. Alaska Railroad*, 659 F.2d 243 (D.C. Cir. 1981). MTD Order at 15, 17. *Sea-Land* considered the personhood status of railroads owned and operated by the federal government and organized as agencies, along with certain officials. 659 F.2d at 244. The opinion focused on whether an amendment to the Sherman Act authorizing the United States to file suit impacted the personhood status of the agencies and officials before the Court. The D.C. Circuit found the amendments had no impact. *Id.* at 246.

The opinion also stated that "Congress did not place the United States or its instrumentalities under the governance of the Sherman Act." *Id.* at 244. As no instrumentality was before the court, that term is dropped from *Sea-Land's* holding. *See id.* at 246 ("we *hold* that the United States, its *agencies and officials*, remain outside the reach of the Sherman Act") (emphasis added). This *dicta* is the sole support for the court's premise that "[o]ne of [the] 'rights' of an instrumentality … is immunity from antitrust suit." MTD Order at 15 (citing *Sea-Land*).

If *Sea-Land* is read to hold that instrumentalities are outside the Sherman Act's scope regardless of form and function, it conflicts with *Flamingo*. To be sure, *Flamingo* observed that *Sea-Land's* two-stage approach to resolving the personhood question – first considering whether the entity has sovereign immunity, and then whether the Sherman Act reaches the entity – was "correct." 540 U.S. at 744. That approach is not in dispute. But it did *not* restate *Sea-Land's* broad *dicta* suggesting

-12-

instrumentalities are not Sherman Act persons regardless of form and function.

*Sea-Land* preceded *Flamingo* by decades; construed entities with no sue-or-be-sued clauses in their charters; and evaluated agencies owned and operated by the federal government, not independent non-profit corporations. At most, the district court should have distinguished *Sea-Land*, but erred instead by overreading it.

> 3.    There Are Substantial Grounds for Disagreement with the District Court's Application of Flamingo

While the district court recognized that *Flamingo* requires analysis of an entity's form and function, MTD Order at 12, 14, it rested its holding on the Red Cross' instrumentality status. *Id.* at 19. Given its holding, it is not clear what purpose the court's review of form and function served. In any event, reasonable jurists may disagree with the analysis conducted.[4]

As for form, the district court acknowledged the Red Cross is a corporation, and corporations are textually subject to the Sherman Act. MTD Order at 12. As noted, *Flamingo* said "had Congress chosen to create the Postal Service as a federal corporation, the Court would have to ask whether the Sherman Act's definition

---

[4] Notably, the Red Cross does not agree that *Flamingo* requires analysis of an entity's form-and-function to determine whether its identity is divisible from the United States'. *See* ECF 54 at 8 (describing test as "*Verax*'s preferred 'form and function' test") (emphasis in original); ECF 35 at 7 (claiming "DOJ's 'form and function' test completely misreads *Flamingo*."). It urged the trial court to dismiss the claims on its instrumentality status alone.

extends to the federal entity under this part of the definitional text." 540 U.S. at 737; *see also Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc*., 140 S. Ct. 2082, 2086–87 (2020) (describing the "bedrock principle[] of American law" that a corporation is a "separate legal [entity] with distinct legal rights and obligations").

In response to this argument, the district court noted the Federal Reserve's member banks are organized as corporations and were found to share an identity with the United States for Sherman Act purposes. MTD Order at 15-16 (citing *Jet Courier Servs., Inc. v. Fed. Rsrv. Bank*, 713 F.2d 1221, 1228 (6th Cir. 1983)). *Jet Courier* preceded *Flamingo*, and the Sixth Circuit has since found, based on *Flamingo*, that the Tennessee Valley Authority is a Sherman Act person because it is a corporation. *See* Cert. Order at 5-6 (citing *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 412-14 (6th Cir. 2006)).

Before discussing *McCarthy,* it bears emphasis that there are significant differences in the form and function of Federal Reserve member banks and the Red Cross. *Jet Courier* took note of the Fed's management by federal officials and  "the role of the Federal Reserve System as manager of the fiscal affairs of the federal government and the money supply of the nation." 713 F.2d at 1228. The Fed "functions as the nation's chief money manager. It is this nation's central bank, performing a vital governmental role." *Id.* Its members do not have the discretion of private banks, *i.e.*, they "do not provide ordinary commercial banking services," and

they were "created and are operated in furtherance of the national fiscal policy," *id.*, with "interests … indistinguishable from those of the sovereign." *Id.*

Though member banks issue stock to their owners, the United States holds a residual interest in all of the banks' assets and equity. *See* 12 U.S.C. § 290; *United States v. Wells Fargo & Co.*, 943 F.3d 588, 605 (2d Cir. 2019). The purchase of stock merely entitles the holder to participate in the Federal Reserve system, and to dividends. *See* 12 U.S.C §§ 282, 289, 321. If *Jet Courier* is good law after *Flamingo* and *McCarthy*, it is because the Fed and its banks, in form and function, share an identity with the United States. If it is not distinguishable, *McCarthy* supplants it.

*McCarthy* evaluates the Tennessee Valley Authority, which like the Red Cross is a federal instrumentality and a corporation. *See* 16 U.S.C. §§ 831-831ee; *City of Loudon, Tenn. v. Tennessee Valley Auth.*, 585 F. Supp. 83, 85–86 (E.D. Tenn.), *aff'd*, 754 F.2d 372 (6th Cir. 1984). Despite its federal status, TVA is principally engaged in the private sale of electricity and has virtually unbounded discretion in its contracting and pricing. *See McCarthy*, 466 F.3d at 405–06, 411 n.18. *McCarthy* observed that "some prior cases" found TVA was not subject to the antitrust laws given its federal charter, but *Flamingo* "casts doubt on such a conclusion." *Id.* at 413. Taking note of *Flamingo's* focus on whether USPS was "a federal corporation," the Sixth Circuit found that it supported a conclusion that "TVA is not immune from antitrust liability on" personhood grounds. *Id.* at 413-14.

*McCarthy* did not require an explicit statement from Congress subjecting TVA to antitrust liability, though the TVA – with Presidential appointees on its board, and certain powers of government – has a <u>much</u> better personhood defense than ARC. *See* 16 U.S.C. §§ 831a, 831(c).

The district court acknowledged *McCarthy*, noting "reasonable minds can (and do) differ." Cert. Order at 6. The Red Cross has claimed *McCarthy* is not good law under the law-of-the-circuit doctrine, given *Jet Courier*. But if *Jet Courier* cannot be reconciled with *McCarthy* (let alone *Flamingo*), *McCarthy* controls, as it relied on an intervening Supreme Court decision. *See The Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720 (6th Cir. 2016) ("Although one panel may not disturb the ruling of a prior panel absent en banc review … an intervening Supreme Court decision gives us the right to revisit this question").

The Red Cross also claimed *McCarthy's* personhood holding was not "necessary" to its disposition. But *McCarthy* answered two antitrust questions: (i) whether TVA is a "person;" and (ii) whether it is immune pursuant to the state-action doctrine. It found TVA, while a person, is immune. 466 F.3d at 413-14. Neither portion is *dicta*, which "comprises observations in a judicial opinion or order that are 'not essential' to the determination of the legal questions then before the court." *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007). The Sixth Circuit's evaluation of *Flamingo* was necessary to its resolution of the personhood question.

As for function, the trial court found "ARC's 'goals, obligations, and powers' support treating ARC as a public rather than a private entity." MTD Order at 18. Though it recognized "ARC's enabling statute does not endow it with 'powers more characteristic of Government than of private enterprise,'" it found "on balance, ARC's public attributes outweigh its private ones." *Id.*

In so holding, the district court misapplied a key aspect of *Flamingo*. The court stated that in *Flamingo* "USPS's statutory status as an '<u>independent establishment</u> of the executive branch' weighed in <u>favor</u> of treating it as one with the federal government, not <u>against</u> doing so," so appeared to count the Red Cross' independence in its favor, not against it. MTD Order at 19 (emphasis in original). The key terms from this citation, however, are "of the executive branch," not "independent." Indeed, the sentence that follows drops the term "independent." *Id.*

As noted, an "independent establishment" is like an "agency" under federal law. See 5 U.S.C. § 105. Independent agencies like the SEC or FTC, or an independent establishment like the Postal Service, differ from executive agencies like DOJ in that, while part of the executive branch, their leadership is not removable at will by the President. *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935). Such establishments or agencies are "independent" in that limited sense.

The Red Cross is different. It is not an independent establishment *of* the executive branch, it is independent *from* the executive branch all together.

There are substantial grounds to disagree with the Court's application of *Flamingo* when discussing the Red Cross' form and function.

### C.     *Interlocutory Review Would Likely Advance the Ultimate Disposition of this Case*

The district court recognized that "a reversal would expand" the "number of claims proceeding through discovery and possibly trial" but found that potential cost outweighed by the likely benefits, by "curb[ing] the risk that [the] parties have to proceed twice through discovery, trial, and appeal, first for the two remaining claims and then, if the First Circuit reverses the Court's order after final judgment, for the antitrust claims." Cert. Order at 6-7. Judge Saris has served on the federal bench since 1993 (including seven years as Chief Judge); as to the best way to handle this case, it makes sense to defer to a jurist who has overseen thousands of trials.

The conclusion is reasonable. By avoiding the prospect of reversal after judgment, followed by duplicative discovery, summary judgment, and trial, review will likely reduce costs. *See Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir.1974) ("saving of time of the district court and of expense to the litigants was deemed by the sponsors [of § 1292(b)] to be a highly relevant factor"). Antitrust cases are especially appropriate for review. *See White v. Nix*, 43 F.3d 374, 376 (8th Cir. 1994) (§ 1292(b) appropriate where "appeal may avoid protracted and expensive litigation, as in antitrust and similar protracted cases."); *Milbert v. Bison Lab'ys, Inc.*, 260 F.2d 431, 433 (3d Cir. 1958) (same); *Amphastar Pharms., Inc. v. Momenta*

*Pharms., Inc.*, 313 F. Supp. 3d 366, 369 (D. Mass. 2018) (similar).

The Red Cross has argued that interlocutory review will not "terminate" or "drastically curtail" this case, so can't advance it. *See* ECF 54 at 12. But just as many kinds of questions may be "controlling," there are many ways to advance a case.

One way is when review prevents "unnecessary proceedings on issues that should have been dismissed." *See* 16 Federal Practice and Procedure Jurisdiction § 3931 (3d ed.). But another is when review may avoid "unnecessary duplication of proceedings after reversal for trial of issues that should not have been dismissed," as may arise when a plaintiff seeks review. *Id.* Plaintiffs with dismissed claims can and do obtain relief under Section 1292(b). *See, e.g., Lane v. First Nat'l Bank of Bos.*, 871 F.2d 166, 167 (1st Cir. 1989) (accepting review of order granting dismissal on Eleventh Amendment grounds); *Rivera-Nazario*, 2016 WL 11815752, at *3.[5]

Otherwise, ARC focused on the fact that when it moved to dismiss, it asserted other grounds for dismissal not resolved by the Order. The argument is misguided. *First,* the Red Cross' other defenses were all variations of the same theme: that Verax's product does not compete in the same relevant market as the Red Cross'

---

[5] *See also Perez v. Preston*, 2016 WL 10637099, at *1 (N.D. Ga. Nov. 22, 2016), *certified question answered sub nom. Sec'y, U.S. Dep't of Lab. v. Preston*, 873 F.3d 877 (11th Cir. 2017); *Holliday v. Xerox Corp.*, 555 F. Supp. 51, 57 (E.D. Mich. 1982), *aff'd*, 732 F.2d 548 (6th Cir. 1984); *Pollack v. Laidlaw Holdings, Inc.*, 993 WL 254932, at *4 (S.D.N.Y. June 25, 1993).

offering. The resolution of this question is one of fact, not law, and applicable to this case only. *Second*, the tying and exclusive dealing claims Verax alleged are not novel. Aside from the personhood question, Verax's Complaint presents no novel issues of law that could give rise to another interlocutory appeal.

Section 1292(b) "does not require the appeal to certainly advance the termination of the litigation." *Louisiana State Conf. of NAACP v. Louisiana*, 495 F. Supp. 3d 400, 416–17 (M.D. La. 2020). It asks if an appeal "may materially advance" the case's end. 28 U.S.C. § 1292(b). That standard is satisfied here.

## II. THIS CASE IS EXCEPTIONAL

In recognition of the exceptional nature of this case, DOJ's Antitrust Division filed its Statement of Interest, one of just eight it filed in all of 2023, in district court or the courts of appeal. *See* https://www.justice.gov/atr/statements-interest. The logic of the challenged order is not limited to the parties; under it, all instrumentalities – and presumably all federal agencies and establishments, no matter their form or function – would fall outside the Sherman Act's reach unless Congress explicitly legislated to the contrary in the entity's charter.

The case itself concerns competition and, thus, consumer welfare in two critical healthcare markets, blood platelets and bacterial mitigation. Coupled with the broader implications of the court's holding, the certified Order presents an especially strong vehicle for interlocutory review.

Dated:  July 8, 2024

Respectfully submitted,

By: _/s/ Scott Abeles_____

Scott Abeles, Bar No. 1213004
Benjamin Stoll, Bar No. 1212466
**CARLTON FIELDS, P.A.**
Suite 400 West
1025 Thomas Jefferson Street, NW
Washington, DC 20007
Telephone: (202) 965-8189
Facsimile: (202) 965-8104

*Counsel for Petitioner*
*Verax Biomedical Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the word limit of Fed. R. App. P. 5(c)(1) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 5,133 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 word processing system in 14-point Times New Roman font.

/s/ *Scott Abeles*
Scott Abeles

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 8, 2024, I served this Petition for Interlocutory Review,

via email, to the following Counsel of Record:

William J. Trach (BBO # 661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
william.trach@lw.com

Amanda P. Reeves (*pro hac vice* pending)
Jennifer L. Giordano (BBO # 650537)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
amanda.reeves@lw.com
jennifer.giordano@lw.com

Alfred C. Pfeiffer (*pro hac vice* pending)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
al.pfeiffer@lw.com

*Counsel for the American Red Cross*

Elizabeth K. Keeley (Bar ID #669311)
BUTTERS BRAZILIAN LLP
699 Boylston Street, 12th Floor
Boston, Massachusetts 02116
Telephone: (617) 367-2600
keeley@buttersbrazilian.com

*Counsel for Petitioner*
*Verax Biomedical Inc.*

/s/ *Scott Abeles*
Scott Abeles

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                    )
VERAX BIOMEDICAL INC.,              )
                                    )
                 Plaintiff,         )
                                    )         Civil Action
v.                                  )         No. 23-10335
                                    )
AMERICAN NATIONAL RED CROSS,        )
                                    )
                 Defendant.         )
_____)
```

## MEMORANDUM AND ORDER

January 19, 2024

Saris, D.J.

### INTRODUCTION

Defendant American National Red Cross ("ARC") is the largest supplier of blood platelets in the United States. Platelets are used to treat patients with cancer, blood disorders, critical injuries, and major surgeries. But platelets are susceptible to bacterial contamination, which can cause serious side effects in transfusion recipients. In the past, ARC sold platelets to hospitals, which then separately employed services to mitigate the risk of platelets becoming infected ("mitigation services"). The United States Food and Drug Administration ("FDA") has endorsed the safety and effectiveness of multiple mitigation services. Plaintiff Verax Biomedical Inc. ("Verax") manufactures one such

1

mitigation service, a test called PGDprime[1] that detects bacterial growth.

In July 2020, ARC announced its plan to pretreat all platelets it sold using Cerus Corporation's INTERCEPT Blood System, an FDA-approved pathogen reduction treatment. Verax's PGDprime can be used with other mitigation services, but not with INTERCEPT. Verax now sues ARC for allegedly leveraging its power in the market for platelets to monopolize the market for mitigation services, in violation of the Sherman Act (Counts I-III). Verax also alleges that ARC made false and disparaging statements about PGDprime to Verax's customers, in violation of state law (Counts IV-VI). ARC moves to dismiss all counts pursuant to Fed. R. Civ. P. 12(b)(6). After a hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** ARC's motion (Dkt. 18).

**BACKGROUND**

Drawing all inferences in favor of Verax, the Court accepts the following factual allegations from the complaint as true.

## I.    **Blood Platelets**

Platelets are "cell fragments in blood that bind together to form clots, which stop bleeding and repair damaged blood vessels." Dkt. 1 at 5. The human body naturally produces its own platelets, but some patients "need recurring platelet transfusions because

---

[1] Stylized as "PGD*prime*." <u>See, e.g.</u>, Dkt. 1 at 4.

their illnesses prevent or reduce the formation of platelets[,] or degrade the effectiveness" of the platelets. Id. at 6. Hospitals purchase platelet "doses" -- bags each containing enough platelets for a single transfusion -- from "blood centers" that collect and process platelets from unpaid volunteers. Id.

The national market for platelets is "severely supply constrained." Id. at 7. This is partly because extracting a donor's platelets is more intensive than collecting other blood products. Drawing platelets from a single donor takes around three hours and yields only one to three doses. Platelets are scarce also because they are susceptible to bacterial contamination that renders them unsafe for transfusion. This gives them a short shelf-life once harvested. Moreover, the onset of the COVID-19 pandemic led to a ten-percent decline in platelet donations. ARC has called the current shortage of platelets and other blood products a "national blood crisis." Id.

## II.  **Bad Blood**

Because platelets are prone to bacterial contamination, FDA regulations require "[b]lood collection establishments and transfusion services [to] assure that the risk of bacterial contamination of platelets is adequately controlled using FDA approved or cleared devices or other adequate and appropriate methods found acceptable for this purpose by FDA." 21 C.F.R. § 606.145(a) (2015). In September 2019, the FDA published

nonbinding guidance listing mitigation services compliant with 21 C.F.R. § 606.145(a). See U.S. Food & Drug Admin., Bacterial Risk Control Strategies for Blood Collection Establishments and Transfusion Services to Enhance the Safety and Availability of Platelets for Transfusion: Guidance for Industry (2019) ("2019 Guidance"). The 2019 Guidance recommends mitigation services including Pathogen Reduction Treatment ("PRT"), which is a chemical and light treatment that inhibits bacterial growth, and Large Volume Delayed Sampling ("LVDS"), Primary Culture, and Rapid Secondary Testing, which are bacterial testing protocols. Id. at 5-8. Notably, the FDA endorses PRT and LVDS as "single-step strateg[ies]," meaning that applying either one on its own satisfies the FDA's regulations and renders platelets safe for transfusion within a certain timeframe. Id. at 5. By contrast, the 2019 Guidance lists Rapid Secondary Testing as half of a "two-step strategy," meaning that it needs to be used in conjunction with LVDS or Primary Culture to render platelets safe and FDA-compliant. The FDA does not endorse using Rapid Secondary Testing together with PRT. See generally id. at 5-8.

In December 2020, the FDA updated the 2019 Guidance to extend the deadline for implementing its recommendations until October 2021. See U.S. Food & Drug Admin., Bacterial Risk Control Strategies for Blood Collection Establishments and Transfusion Services to Enhance the Safety and Availability of Platelets for

Transfusion: Guidance for Industry (2020) ("2020 Guidance"). "The FDA has expressed no preference" among its recommended mitigation services. Dkt. 1 at 9. Nevertheless, mitigation services differ in price and in their effects on platelet quality, platelet shelf-life, "dose, availability[,] and other factors that could affect clinical utility." Id. at 10; 2020 Guidance at 5-8.

## III. **Parties**

Verax is a corporation with its principal place of business in Marlborough, MA. Verax develops, validates, and commercializes FDA-cleared tests for detecting bacterial growth in platelets. Verax's products include PGDprime, a Rapid Secondary Test that it sells to hospitals. PGDprime "takes only three minutes to perform," "generates results in about thirty minutes," "uses only a nominal sample of each platelet dose," "has no adverse impact on platelet quality or efficacy," results in platelets with a seven-day shelf-life, and costs only $25 per dose. Dkt. 1 at 12-13.

ARC is a federally chartered nonprofit corporation with its principal place of business in Washington, D.C. It was founded in 1881, reincorporated in 1893, and given its first federal charter in 1900. Am. Nat'l Red Cross v. S.G., 505 U.S. 247, 250 (1992). By statute, ARC is responsible for "provid[ing] volunteer aid in time of war to the sick and wounded of the Armed Forces" pursuant to the United States's obligations under the Geneva Convention and other treaties. 36 U.S.C. § 300102(1). It is also tasked with

"carry[ing] out a system of national and international relief in time of peace, and . . . apply[ing] that system in mitigating the suffering caused by . . . great national calamities." Id. § 300102(4). Among other activities, ARC "collects free donated platelets at its blood centers" and sells those platelets to hospitals across the country. Dkt. 1 at 7. ARC is "the largest supplier of platelets in the United States," accounting for "more than 40% of all platelets sold" in the country. Id. It is "the sole supplier of platelets to many hospitals and in some regions in the United States." Id.

In 2007, Congress added language to ARC's statutory charter describing it as "a Federally chartered instrumentality of the United States." See The American National Red Cross Governance Modernization Act of 2007, Pub. L. No. 110-26, § 3(1), 121 Stat. 103 (2007) (codified at 36 U.S.C. § 300101(a)) ("Modernization Act"). In the Modernization Act, which amended the charter, Congress stated that ARC "is and will remain a Federally chartered instrumentality" and that ARC has "the rights and obligations consistent with that status." Id. §§ 2(b)(4)-(5). Since 1905, ARC's charter has allowed it to "sue and be sued." 36 U.S.C. § 300105(a)(5); see also 36 U.S.C. § 2 (1905).

## IV.   ARC's Policy Change

Prior to July 2020, ARC sold both platelets treated with PRT and so-called "untreated" platelets "that had been tested with

6

either a Primary Culture or LVDS" but not treated with PRT. Dkt. 1 at 13. ARC's untreated platelets were "compatible with multiple different bacteria mitigation services," including Verax's less expensive PGDprime, so hospitals buying platelets from ARC could choose which mitigation services to use and from whom to purchase them. Id.

In July 2020, ARC announced plans to stop selling untreated platelets and to perform PRT on all platelets prior to sale. ARC entered an exclusive dealing contract with Cerus Corporation ("Cerus"), which produces the INTERCEPT Blood System, the only FDA-approved PRT technology for platelets. Dkt. 1 at 10, 16. Per their contract, ARC has agreed to sell only platelets treated with INTERCEPT to hospitals. ARC has indicated that it will fully transition to selling only platelets treated with INTERCEPT by some point in 2023.

PRT technologies like INTERCEPT "result[] in the loss of approximately 10-15% of the platelet product," "degrade[] platelets, rendering them less efficacious," result in platelets with only a five-day shelf-life, and are more expensive than other mitigation services. Id. at 10-11, 14 (noting that ARC's INTERCEPT-treated platelets will cost hospitals $150 per dose). PRT "has been associated with two transfusion-related deaths from sepsis caused by bacterial contamination" that the treatment did not eliminate. Id. at 11. According to Verax, ARC's plan will make it

"impossible" for hospitals to purchase mitigation services from Verax, as the FDA has not endorsed pairing Rapid Secondary Tests like PGDprime with PRT technologies like INTERCEPT. Id. at 14. Verax alleges that ARC's policy will harm patients by decreasing platelet quality and increasing safety risks, and harm hospitals by raising costs and eliminating choice.

## V.   ARC's Statements about Verax

Verax claims that over the course of several years, ARC knowingly made a series of false or misleading statements about PGDprime to Verax's customers. For example, in July 2020, ARC sent hospitals that purchased PGDprime a document titled "The American Red Cross Approach to Platelet Safety, Implementation Plan for Bacterial Control Strategies, Frequently Asked Questions" ("FAQ"). Dkt. 1 at 17. ARC also published the FAQ on its website. In it, ARC asserted first that "secondary, point-of-issue . . . bacterial testing (e.g., the Verax PGD test) involves a new testing regimen for most hospitals, is time consuming to perform and involves significant cost both in materials and staff time." Id. Second, it declared that "[PRT] platelets offer the best and most efficacious approach to ensuring platelet safety while sustaining the blood supply." Id. at 18. Third, it stated that providing platelets compatible with Verax's test would "add additional costs and inventory management complexity[,] potentially compromising the platelet supply." Id. Fourth, it explained that ARC decided to

sell only PRT-treated platelets to "protect the safety and
availability of the platelet supply." Id. Fifth, it expressed that
PRT "contributes to a stronger blood supply by qualifying more
units for transfusion through the elimination of false positives
associated with . . . rapid testing." Id. at 19. And sixth, it
touted that PRT-treated platelets "offer substantial patient
safety benefits and improved inventory simplification." Id.

ARC also discussed Verax in its Winter 2020 newsletter, which
ARC published online and distributed to hospitals including
Verax's customers. The newsletter stated that "[p]erformance of
secondary . . . rapid testing (e.g., Verax testing) adds
additional labor, cost to the transfusion service, and reduces the
final product volume." Id. at 20. Finally, between 2015 and October
2021, ARC told Verax's customers that PGDprime could not extend
the shelf-life of untreated platelets sold by ARC from five to
seven days. During the same period, ARC tried to convince Verax's
customers to switch from buying untreated platelets to buying PRT-
treated platelets by stating that "PRT broadly qualifies for
Medicare/Medicaid reimbursement, implying that PGDprime did not,"
even though "both PRT and PGDprime qualify for reimbursement under
the exact same circumstances." Id. at 21.

## VI.  **Procedural History**

Verax filed this suit against ARC on February 14, 2023. See
Dkt. 1. It raised three counts under the Sherman Act: tying

(Count I), exclusive dealing (Count II), and attempted monopolization (Count III). It also raised three counts under state law: unfair methods of competition and unfair and deceptive practices (Count IV), defamation (Count V), and tortious interference with contractual relations (Count VI). ARC moved to dismiss all counts on April 17, 2023. See Dkt. 18. On August 4, 2023, the United States filed a statement of interest under 28 U.S.C. § 517, arguing that contrary to ARC's assertions, ARC can be sued under the Sherman Act. See Dkt. 34. The Court held a hearing on the motion on September 28, 2023. See Dkt. 39.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the well-pleaded allegations in the complaint as true and construes reasonable inferences in the plaintiff's favor. Breiding v. Eversource Energy, 939 F.3d 47, 49 (1st Cir. 2019). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [the court] to draw on [its] judicial experience and common

sense." <u>Schatz v. Republican State Leadership Comm.</u>, 669 F.3d 50, 55 (1st Cir. 2012) (cleaned up).

**DISCUSSION**

## I.    Antitrust Claims (Counts I-III)

Verax brings three claims under the Sherman Act: tying (Count I), exclusive dealing (Count II), and attempted monopolization (Count III). The Sherman Act prohibits "contract[s], combination[s] . . . or conspirac[ies], in restraint of trade or commerce," as well as "attempt[s] to monopolize . . . any part of" interstate commerce. 15 U.S.C. §§ 1-2. As a preliminary matter, parties dispute whether ARC is subject to liability under the Sherman Act at all. To determine whether the Sherman Act reaches ARC, the Court applies the two-step analysis articulated in <u>FDIC v. Meyer</u>, 510 U.S. 471, 484 (1994). The Court must first ask whether there is a waiver of sovereign immunity for actions against ARC. <u>U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.</u>, 540 U.S. 736, 743 (2004). The second question is "whether the substantive prohibitions of the Sherman Act apply" to ARC. <u>Id.</u>

The answer to the first question is yes. Since 1905, ARC's statutory charter has stated that ARC may "sue and be sued in courts of law and equity, State or Federal, within the jurisdiction of the United States." 36 U.S.C. § 300105(a)(5); <u>see</u> 36 U.S.C § 2 (1905). This language in the charter constitutes a waiver of ARC's sovereign immunity. <u>See</u> <u>Flamingo</u>, 540 U.S. at 743. But "[a]n

absence of immunity does not result in liability if the substantive law in question is not intended to reach the federal entity." Id. at 744. Thus, the next question is whether "the substantive antitrust liability defined by the statute extends to" ARC. Id.

As to the second question, the Sherman Act "imposes liability on any 'person,'" which includes "corporations and associations existing under or authorized by the laws of . . . the United States." Flamingo, 540 U.S. at 744-45 (citing 15 U.S.C. § 7). "[T]he United States is not an antitrust 'person,' in particular not a person who can be an antitrust defendant." Id. at 745. "The remaining question, then, is whether for purposes of the antitrust laws," ARC "is a person separate from the United States itself." Id. at 746. ARC argues that as a federal instrumentality, it is not. Both Verax and the United States argue that it is.

The Supreme Court's decision in United States Postal Service v. Flamingo Industries (USA) Ltd. gives a birds-eye view of the legal framework. Id. At issue in Flamingo was whether the United States Postal Service ("USPS") is an antitrust "person" separate from the United States. Id. at 746. Analyzing both the "form and function" of USPS, the Court held that it is "part of the Government of the United States and so is not controlled by the antitrust laws." Id. at 748.

As to form, the Court focused on USPS's enabling statute, which describes it as "an independent establishment of the

executive branch of the Government of the United States." Id. at 740 (citing 39 U.S.C. § 201). This "statutory designation," the Court held, is "not consistent with the idea that [USPS] is an entity existing outside the Government." Id. at 746. Had Congress created USPS as a corporation, the Court suggested it "would have [had] to ask whether the Sherman Act's definition" of a "person," which includes corporations, covered USPS. Id. But the Court did not decide whether or under what circumstances a federally chartered corporation would be an antitrust person separate from the United States. Id.

As to function, the Court noted that USPS has "different goals, obligations, and powers from private corporations." Id. at 747. The Court stated that "[t]he most important difference" between USPS and private corporations is that USPS "does not seek profits, but only to break even, . . . which is consistent with its public character." Id. USPS also fulfills public obligations "including the provision of universal mail delivery, the provision of free mail delivery to certain classes of persons, and . . . increased public responsibilities related to national security." Id. (internal citation omitted). Finally, the Court noted that USPS exercises "many powers more characteristic of Government than of private enterprise," including "the power of eminent domain, and the power to conclude international postal agreements," which

also supported treating USPS as a public rather than private entity under the antitrust laws. Id.

Two years after Flamingo, the Sixth Circuit considered whether the Tennessee Valley Authority ("TVA"), a corporation created by federal statute, is subject to liability under the Sherman Act. See McCarthy v. Middle Tenn. Elec. Membership Corp., 466 F.3d 399, 412-14 (6th Cir. 2006) (citing 16 U.S.C. § 831). Noting it was not an "easy question," the Sixth Circuit held that TVA is a separate antitrust person from the federal government. Id. at 414 (quoting Flamingo, 540 U.S. at 746). The court reasoned that "the key distinction presented by Flamingo, that the TVA is a federal corporation unlike the Postal Service, supports the conclusion that the TVA is not immune from antitrust liability" even though it has "certain public characteristics." Id.

With Flamingo as a guide, this Court concludes that in both form and function, ARC is not an antitrust person. The issue is close.

### A. Form

First, ARC's enabling statute demonstrates a congressional intent to treat it as an instrumentality of the federal government. Three years after Flamingo, Congress codified ARC's status as "a Federally chartered instrumentality of the United States" and affirmed that it "has the rights and obligations consistent with that status." Modernization Act §§ 2(b)(4)-(5) (codified at 36

U.S.C. § 300101(a)). One of those "rights" of an instrumentality of the United States is immunity from antitrust suit. See Sea-Land Serv., Inc. v. Alaska R.R., 659 F.2d 243, 244 (D.C. Cir. 1981) (Ginsburg, J.) ("Congress did not place the United States or its instrumentalities under the governance of the Sherman Act."). This Court treats Congress' "choice of words [as] more informed than unconsidered," see Flamingo, 540 U.S. at 746, especially given that Congress has also "create[d] entities and confer[red] upon them non-governmental status" when it has intended to do so, Baker v. Runyon, 114 F.3d 668, 671 (7th Cir. 1997); see, e.g., 47 U.S.C. § 396(b) (creating the "Corporation for Public Broadcasting" but stating it "will not be an agency or establishment of the United States Government"). "The mere fact that Congress even had to explicitly waive [ARC's] sovereign immunity . . . in the first place" supports the argument that Congress views ARC as an arm of the sovereign. See Robinson v. Runyon, 149 F.3d 507, 516-17 (6th Cir. 1998); Baker, 114 F.3d at 671. "[O]therwise such a waiver would be unnecessary." Robinson, 149 F.3d at 517.

Verax contends that ARC's status as a federal corporation alone places it within the Sherman Act's ambit. The caselaw does not support that ironclad rule. For example, the Sixth Circuit held that Federal Reserve Banks, which are federal corporations, are not separate antitrust persons from the United States government because of the "role of the Federal Reserve System as

15

manager of the fiscal affairs of the federal government and the money supply of the nation." Jet Courier Servs., Inc. v. Fed. Rsrv. Bank, 713 F.2d 1221, 1228 (6th Cir. 1983). Corporate form is not dispositive of antitrust personhood; the corporation's function matters too.

In its statement of interest, the United States insists that ARC is a federal instrumentality only for the limited purpose of immunity from state taxation. In Department of Employment v. United States, the Supreme Court held that "federal instrumentalities like the Red Cross" are "exempt from state taxation." 385 U.S. 355, 361 (1966). The United States argues that Congress expressly refers to Department of Employment in the Modernization Act's prefatory language:

> The United States Supreme Court held The American National Red Cross to be an instrumentality of the United States, and it is in the national interest that the Congressional Charter confirm that status and that any changes to the Congressional Charter do not affect the rights and obligations of The American National Red Cross to carry out its purposes.

Modernization Act § 2(a)(7) (emphasis added). According to the United States, Congress's reference to Department of Employment evinces an intent to codify only ARC's tax immunity, not full instrumentality status. But the United States overlooks the rest of the Modernization Act. In the same section cited by the United States, Congress states twice without qualification that ARC "is and will remain a Federally chartered instrumentality of the United

16

States" with "the rights and obligations consistent with that status." Modernization Act §§ 2(b)(4)-(5). As noted above, one such "right" is immunity from antitrust suit. Sea-Land, 659 F.2d at 244. If Congress intended to limit ARC's instrumentality status, it would have stated so explicitly in ARC's amended charter. Compare 12 U.S.C. §§ 1716b, 1723a(c)(2) (creating the Federal National Mortgage Association as a "[g]overnment-sponsored private corporation" and exempting it "from all taxation now or hereafter imposed by any [s]tate"), with 36 U.S.C. § 300101(a) (providing that ARC is "a Federally chartered instrumentality of the United States"). Although this issue is less than clear, the language of ARC's statutory charter, which does not contain a limitation, controls.

The United States also maintains that ARC is a separate antitrust person because "the United States does not own, control, or supervise the ARC." Dkt. 34 at 6. However, governmental ownership and control are not dispositive of personhood under the Sherman Act. See Flamingo, 540 U.S. at 747. The decisions cited by the United States are inapposite because they involve different claims with different legal standards. See, e.g., Dep't of Transp. v. Ass'n of Am. R.R., 575 U.S. 43, 53 (2015) (holding that under the Due Process Clause, Amtrak is not an "autonomous private enterprise" due to its "unique features and its significant ties to the Government"); Forsham v. Harris, 445 U.S. 169, 186 (1980)

(holding that a federal grantee was not an agency under the Freedom
of Information Act). Moreover, the sole antitrust case the United
States cites in support treated governmental ownership as
"immaterial" to personhood analysis. See <u>Jet Courier Servs.</u>, 713
F.2d at 1228 (focusing on public goals and responsibilities).

### B. Function

Second, ARC's "goals, obligations, and powers" support
treating ARC as a public rather than a private entity. <u>Flamingo</u>,
540 U.S. at 747. In <u>Flamingo</u>, the Court stated that the "most
important difference" between USPS and private enterprises was
that USPS "does not seek profits." <u>Id.</u> ARC is a nonprofit
corporation. Moreover, ARC's charter requires it to fulfill a
variety of public functions, <u>see id.</u>, including effectuating
treaty obligations and coordinating domestic and international aid
both during peacetime and during war or emergency, 36 U.S.C.
§ 300102. It is true that ARC's enabling statute does not endow it
with "powers more characteristic of Government than of private
enterprise" such as eminent domain or the ability to conclude
international agreements. <u>Flamingo</u>, 540 U.S. at 747; <u>see</u> 36 U.S.C.
§ 300105 (listing ARC's powers). Even so, on balance, ARC's public
attributes outweigh its private ones for this analysis. <u>Cf.</u>
<u>Robinson</u>, 149 F.3d at 516 ("Although the Postal Service has
'commercial like' operation, it functions as part of the federal
government."); <u>Baker</u>, 114 F.3d at 670 ("The Postal Service may be

run in a manner <u>similar</u> to a private commercial entity, but it is not a private commercial entity.").

The United States contends that because ARC's goals require it to work independently of the government, it is a separate antitrust person. <u>See</u> Dkt. 34 at 11 (citing 36 U.S.C. § 300102(3)). In <u>Flamingo</u>, USPS's statutory status as an "<u>independent establishment</u> of the executive branch" weighed in <u>favor</u> of treating it as one with the federal government, not <u>against</u> doing so. <u>See</u> 540 U.S. at 740 (emphasis added). Finally, the United States asserts that because "[f]ederal courts have repeatedly concluded that . . . the ARC is a corporate 'person' separate from the United States itself," the same should follow here. Dkt. 34 at 5. But the decisions the United States relies on predate the 2007 amendment to ARC's statutory charter, and again, they discuss ARC's governmental status under distinct legal regimes and standards. <u>See, e.g.</u>, <u>Hall v. Am. Nat'l Red Cross</u>, 86 F.3d 919, 922 (9th Cir. 1996) (Religious Freedom Restoration Act); <u>Marcella v. Brandywine Hosp.</u>, 47 F.3d 618, 624 (3d Cir. 1995) (trial by jury); <u>Irwin Mem'l Blood Bank of the S.F. Med. Soc'y</u>, 640 F.2d 1051, 1057 (9th Cir. 1981) (Freedom of Information Act); <u>Rayzor v. United States</u>, 937 F. Supp. 115, 119 (D.P.R. 1996) (Federal Tort Claims Act).

Because ARC is an instrumentality of the United States, it is not a "person" separate from the United States under the Sherman Act. Verax's antitrust claims are dismissed.

## II.  **Defamation (Count V)**

Verax also sues ARC for defamation. To state a claim for defamation, Verax must show that ARC "published a false statement about [it] to a third party that . . . caused [it] economic loss or was of the type that is actionable without proof of economic loss." Phelan v. May Dep't Stores Co., 819 N.E.2d 550, 553 (Mass. 2004). Verax alleges that ARC defamed it by telling Verax's customers "that Verax's PGDprime test is less safe, more expensive, and less effective than" Cerus's INTERCEPT technology, which caused Verax "substantial economic harm in the form of lost sales and revenues." Dkt. 1 at 45-46. ARC argues that at most, it disparaged PGDprime, not Verax.

"A threshold issue in a defamation action, whether a communication is reasonably susceptible of a defamatory meaning, is a question of law for the court." Phelan, 819 N.E.2d at 554. The Court applies "an objective test . . . inquir[ing] into a reasonable recipient's understanding of the words rather than the speaker's intent." New Eng. Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper Co., 480 N.E.2d 1005, 1010 (Mass. 1985). A disparaging statement about the plaintiff's product may be defamatory to the plaintiff when its "imputation fairly implied is that the plaintiff is dishonest or lacking in integrity, or that he is deliberately perpetuating a fraud upon the public by selling a product which he knows to be defective." See HipSaver, Inc. v.

Kiel, 984 N.E.2d 755, 762 n.6 (Mass. 2013) (quoting W.L. Prosser
& W.P. Keeton, Torts § 128, at 965 (5th ed. 1984)). Here, Verax's
allegations fall short of that bar.

Verax alleges that ARC told its customers, among other things,
that PGDprime "is time consuming to perform and involves
significant cost both in materials and staff time," Dkt. 1 at 17,
that using PGDprime would "add additional costs and inventory
management complexity[,] potentially compromising the platelet
supply," id. at 18; see also id. at 21, that PRT "contributes to
a stronger blood supply by qualifying more units for transfusion
through the elimination of false positives associated with . . .
rapid testing," id. at 19, and that PGDprime could not extend the
shelf-life of untreated platelets sold by ARC from five to seven
days, id. at 21. Regardless of their truth or falsity, these
statements are criticisms of PGDprime, not of Verax, and could not
reasonably be interpreted as stating or implying that Verax is
"dishonest or lacking in integrity." HipSaver, 984 N.E.2d at 762
n.6 ("[C]ourts generally are reluctant to impute a lack of
integrity to a corporation merely from a criticism of its product."
(cleaned up) (quoting Dairy Stores, Inc. v. Sentinel Publ'g Co.,
516 A.2d 220, 224 (N.J. 1986))). Because Verax has not alleged

that ARC's statements about PGDprime objectively disparaged its
integrity, it fails to state a claim for defamation.

## III. **Tortious Interference with Contractual Relations (Count VI)**

Verax has alleged that ARC tortiously interfered with Verax's
contracts with hospitals to sell PGDprime. Dkt. 1 at 46. To state
a claim for tortious interference with a contract, Verax must show
that "(1) [it] had a contract with a third party; (2) [ARC]
knowingly induced the third party to break that contract; (3)
[ARC]'s interference, in addition to being intentional, was
improper in motive or means; and (4) [Verax] was harmed by [ARC]'s
actions." Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 536 (Mass. 2011).
ARC alleges that Verax has not "identif[ied] a specific contract
that [ARC] allegedly interfered with, or a specific Verax customer"
that ARC induced to breach a contract with Verax. Dkt. 19 at 25.
Verax responds that it has "clearly and precisely defined the set
of customers it lost, even if it did not name each one
individually." Dkt. 23 at 24-25.

Verax has alleged that it had contractual relationships with
hospitals that purchased non-PRT platelets from ARC and employed
PGDprime as their preferred mitigation service. See Dkt. 1 at 13,
36. It has also alleged that ARC communicated with its customers
intending "to convince [them] to switch to [ARC's] PRT service,"
which would require customers to stop using PGDprime. Id. at 21.
Although Verax does not state specific customers it lost, it

22

plausibly alleges that it lost a "substantial" share of its Massachusetts customers. See, e.g., id. at 41. These facts are sufficient to show that ARC interfered with Verax's business relationships. Moreover, Verax has alleged that ARC knew its communications to Verax's customers about PGDprime were false or misleading. Id. at 17-21. Thus, Verax has pleaded improper means. Finally, Verax also claims it "lost sales and revenues," which is sufficient to show damages at this stage. Id. at 46.

## IV.  **Massachusetts Consumer Protection Law (Count IV)**

Verax also brings a claim under Mass. Gen. Laws ch. 93A. Verax alleges that "ARC has engaged . . . in unfair methods of competition and unfair and deceptive practices" by:

> [T]ying its sales of platelets to sales of its platelet bacteria mitigation services, by attempting to monopolize the market for platelet bacteria mitigation services, by coercing its most reliant platelet customers into exclusive dealing arrangements for its platelet bacteria mitigation services, by defaming Verax, by repeatedly issuing false and misleading statements about its and Verax's platelet bacteria mitigation services, and by tort[i]ously interfering with Verax's customer relationships.

Dkt. 1 at 44. ARC argues that insofar as Verax's Chapter 93A claim is derivative of its antitrust, defamation, and tortious interference claims, if those claims are dismissed, this one must be as well. See Skehel v. DePaulis, No. 13-11202, 2017 WL 2380164, at *2 (D. Mass. June 1, 2017) ("Chapter 93A claims [that] are derivative of . . . unsuccessful claims . . . cannot succeed.").

Additionally, ARC contends that Verax has not alleged any
misconduct occurred "primarily and substantially within"
Massachusetts as required under Chapter 93A. Dkt. 19 at 26 (quoting
Mass. Gen. Laws ch. 93A, § 11). Verax responds that its Chapter
93A claim is not wholly derivative of its other claims, and that
the "center of gravity" of its allegations is Massachusetts.
Dkt. 23 at 23 (quoting <u>Bradley v. Dean Witter Realty, Inc.</u>, 967 F.
Supp. 19, 29-30 (D. Mass. 1997)).

Even if this Court accepted ARC's argument about derivative
claims, as noted above, Verax has successfully pleaded tortious
interference, so a Chapter 93A claim based on the same underlying
conduct may proceed. Verax has also alleged that ARC violated
Chapter 93A "by repeatedly issuing false and misleading statements
about its and Verax's platelet bacteria mitigation services,"
which is not derivative of any other claim. Dkt. 1 at 44. ARC does
not dispute that issuing misleading statements would constitute an
unfair and deceptive trade practice under Chapter 93A but argues
that Verax has not satisfied Chapter 93A's geographic
requirements.

Chapter 93A only allows for suit when "the alleged unfair
method of competition or the unfair or deceptive act or practice
occurred primarily and substantially within" Massachusetts. Mass.
Gen. Laws ch. 93A, § 11. Massachusetts courts consider three
factors in determining whether challenged acts occurred "primarily

and substantially in Massachusetts": "(1) where the alleged conduct took place, (2) where the plaintiff received and acted upon the statements, and (3) where the plaintiff's losses were suffered." Bradley, 967 F. Supp. at 29 (citing Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662, 672 (Mass. 1985)).

Verax is based in Massachusetts. It claims that ARC "issu[ed] false, defamatory, misleading, and deceptive statements in Massachusetts to Verax's . . . Massachusetts customers." Dkt. 1 at 44 (emphasis added). Verax further alleges that ARC sent the allegedly misleading FAQ and the Winter 2020 newsletter to Verax's customers, which include the Massachusetts hospitals to whom Verax "often" sells PGDprime. Id. at 17, 20. Thus, Verax has sufficiently pleaded that it received ARC's statements and suffered losses in Massachusetts. ARC is not based in Massachusetts and Verax notes that it does not know whether ARC issued its FAQ, newsletter, and other communications from Massachusetts, notwithstanding that it may have directed them to Massachusetts hospitals. See Dkt. 23 at 23-24. Nevertheless, because the other two factors weigh in favor of Verax, this Court holds that the conduct occurred primarily and substantially in Massachusetts.

Because at least some of Verax's Chapter 93A theories are adequately pled, the Court does not dismiss.

**ORDER**

For the reasons stated above, ARC's Motion to Dismiss (Dkt. 18) is **ALLOWED IN PART** as to Counts I-III & V, and **DENIED IN PART** as to Counts IV and VI.

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

```
_____
                                  )
VERAX BIOMEDICAL INC.,            )
                                  )
                Plaintiff,        )
                                  )       Civil Action
v.                                )       No. 23-10335
                                  )
AMERICAN NATIONAL RED CROSS,      )
                                  )
                Defendant.        )
_____ )
```

## MEMORANDUM AND ORDER

June 26, 2024

Saris, D.J.

## INTRODUCTION

Blood platelets are used to treat a variety of health conditions. Many hospitals purchase their platelets from Defendant American National Red Cross ("ARC"), the nation's largest supplier. But platelets are susceptible to bacterial contamination that can render them unsafe for use. In the past, hospitals mitigated the risk of platelet contamination by contracting with "mitigation service" providers like Plaintiff Verax Biomedical Inc. ("Verax"), which manufactures a test kit that detects bacterial growth.

Bad blood makes for bad blood. In July 2020, ARC announced plans to pre-treat all platelets it sold using a service from one of Verax's alleged competitors. Verax sued ARC for violating

federal antitrust laws and alleged ARC had made false and disparaging statements about Verax's test kits. ARC moved to dismiss all counts.

On January 19, 2024, the Court allowed ARC's motion to dismiss as to Verax's antitrust claims, holding ARC was not a separate antitrust person from the United States. See Verax v. Am. Nat'l Red Cross, No. 23-10335, 2024 WL 208127, at *5-7 (D. Mass. Jan. 19, 2024).[1] The Court declined to dismiss Verax's claims of tortious interference of contractual relations and violation of Massachusetts Consumer Protection Law. Discovery commenced on April 26, 2024. See Dkt. 49.

The central legal dispute is whether the Sherman Act, 15 U.S.C. §§ 1-2, subjects ARC to antitrust liability. ARC is a federally chartered nonprofit corporation. See 36 U.S.C. § 300101(a). In 2007, Congress amended ARC's statutory charter and clarified its status as "a Federally chartered instrumentality of the United States." The American National Red Cross Governance Modernization Act of 2007, Pub. L. No. 110-26, § 3(1), 121 Stat. 103 (2007) (codified at 36 U.S.C. § 300101(a)) ("Modernization Act"). The Sherman Act "imposes liability on any 'person,'" which

---

[1] The Court also dismissed Verax's defamation claim because Verax had "not alleged that ARC's statements" had "objectively disparaged its integrity." See Verax, 2024 WL 208127, at *7. Verax does not seek interlocutory appeal of the defamation claim's dismissal.

includes corporations, but it does not extend liability to the United States or its instrumentalities. See U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd., 540 U.S. 736, 744-45 (2004); Sea-Land Serv., Inc. v. Alaska R.R., 659 F.2d 243, 244-45 (D.C. Cir. 1981) (Ginsburg, J.). The question is "whether for purposes of the antitrust laws," ARC "is a person separate from the United States itself." Flamingo, 540 U.S. at 746. ARC argues it is not, and Verax argues it is.

On May 3, 2024, Verax filed a motion to certify the Court's order dismissing the antitrust claims for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). See Dkt. 52. Verax moved alternatively for the Court to reconsider its order. See id. After hearing and review of the record, the Court **ALLOWS** Verax's Motion to Certify for Interlocutory Appeal (Dkt. 52). The Court **DENIES** its alternative Motion to Reconsider.

## LEGAL STANDARD

Ordinarily, federal appellate courts have jurisdiction to hear appeals only from "final decisions" of the district courts. See 28 U.S.C. § 1291. However, there are limited circumstances in which district courts may certify interlocutory appeals of non-final decisions. See id. § 1292(b). "Interlocutory appeals under § 1292(b) require an order (1) involving a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) for which an immediate appeal from the order may

materially advance the ultimate termination of the litigation."
Caraballo-Seda v. Mun. of Hormigueros, 395 F.3d 7, 9 (1st Cir.
2005) (cleaned up) (quoting 28 U.S.C. § 1292(b)). Courts are meant
to certify interlocutory appeals under § 1292(b) "sparingly and
only in exceptional circumstances." Palandjian v. Pahlavi, 782
F.2d 313, 314 (1st Cir. 1986) (quoting McGillicuddy v. Clements,
746 F.2d 76, 76 n.1 (1st Cir. 1984)).

**DISCUSSION**

## I. Controlling Question

Whether ARC is a separate "person" from the United States
under the Sherman Act is a controlling question of law. A question
of law controls if reversal would "significantly alter[]" the scope
of the case. See Philip Morris Inc. v. Harshbarger, 957 F. Supp.
327, 330 (D. Mass. 1997); Johnson v. Burken, 930 F.2d 1202, 1206
(7th Cir. 1991) ("[A] question is controlling . . . if
interlocutory reversal might save time for the district court, and
time and expense for the litigants." (quotation omitted)); Katz v.
Carte Blanche Corp., 496 F.2d 747, 755 (3d Cir. 1974)
("'[C]ontrolling' means serious to the conduct of the litigation,
either practically or legally."). Reviving Verax's antitrust
claims would "significantly alter[]" the scope of discovery,
trial, and Verax's possible recovery. See Philip Morris, 957 F.
Supp. at 330. Moreover, Verax challenges different conduct in its
dismissed antitrust claims than it does in its surviving state-

law claims. Thus, interlocutory appeal will obviate the risk of
parties having to expend time and resources on multiple rounds of
discovery and possibly multiple trials should the First Circuit
reverse the Court's order on appeal after final judgment. See
Johnson, 930 F.2d at 1206.

## II. <u>Differences of Opinion</u>

There are substantial grounds for differences of opinion
regarding ARC's antitrust personhood. The Court relied on the
Supreme Court's "form and function" test, articulated in <u>United
States Postal Service v. Flamingo Industries (USA) Ltd.</u>, to hold
that ARC is not a separate antitrust person from the United States.
See <u>Verax</u>, 2024 WL 208127, at *4-5 (citing 540 U.S. 736, 746-48
(2004)). As to form, the Court found probative that Congress
amended ARC's charter in 2007 to reflect its status as "a Federally
chartered instrumentality of the United States," with "the rights
and obligations consistent with that status." <u>Id.</u> at *5 (quoting
Modernization Act §§ 2(b)(4)-(5)). The Court interpreted
Congress's language in light of <u>Sea-Land Service, Inc. v. Alaska
Railroad</u>, a District of Columbia Circuit opinion favorably cited
in <u>Flamingo</u>, which held that federal instrumentalities are not
governed by the Sherman Act. <u>Id.</u>; see 659 F.2d 243, 244 (D.C. Cir.
1981) (Ginsburg, J.). Verax argues <u>Flamingo</u> left open whether the
Sherman Act, which "defines 'person' to include corporations,"
applies to federal corporations like ARC. See <u>Flamingo</u>, 540 U.S.

at 746. Applying Flamingo, the Sixth Circuit held that the
Tennessee Valley Authority's status as a federal corporation was
enough to render it a "person" under the Sherman Act. McCarthy v.
Middle Tenn. Elec. Membership Corp., 466 F.3d 399, 412-14 (6th
Cir. 2006). Reasonable minds can (and do) differ regarding ARC's
antitrust personhood.

As to function, the Court found that ARC's "goals,
obligations, and powers" support treating it as one with the United
States. Verax, 2024 WL 208127, at *6-7 (citing Flamingo, 540 U.S.
at 747). Like the United States Postal Service ("USPS") in
Flamingo, ARC "does not seek profits," and is required by charter
to fulfill many public functions. See id. at *6 (citing Flamingo,
540 U.S. at 747). But Verax argues ARC lacks "powers more
characteristic of Government than of private enterprise." Id.
Moreover, Verax contends that "a critical aspect of Flamingo was
that the USPS is entirely controlled by federal actors." See Dkt.
53 at 20 (citing Flamingo, 540 U.S. at 740).

### III. **Materially Advance the Termination of Litigation**

Finally, an immediate appeal from the Court's order may lead
this case to a more efficient resolution than waiting until final
judgment would. It is true, as ARC notes, that a reversal would
expand rather than reduce the number of claims proceeding through
discovery and possibly trial. But as noted above, immediate appeal
will curb the risk that parties have to proceed twice through

discovery, trial, and appeal, first for the two remaining claims
and then, if the First Circuit reverses the Court's order after
final judgment, for the antitrust claims. Allowing this case to
proceed on one track may well lead to timelier resolution.

### ORDER

For the reasons stated above, Verax's Motion to Certify for
Interlocutory Appeal (Dkt. 52) is **ALLOWED**. Its alternative Motion
to Reconsider is **DENIED**.


SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

VERAX BIOMEDICAL INC.,

       Plaintiff,

v.

AMERICAN NATIONAL RED CROSS,

       Defendant.

Civil Action No. 1:23-cv-10335-PBS

<u>**STATEMENT OF INTEREST OF THE UNITED STATES**</u>

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

MAGGIE GOODLANDER
*Deputy Assistant Attorney General*

ANDREW J. FORMAN
*Deputy Assistant Attorney General*

ERIC D. DUNN
*Counsel to the Assistant Attorney General*

ERIC D. WELSH
ANDREW ROBINSON
ZACHARY D. CAPLAN
JOSEPH ADAMSON
MELODY WANG
*Attorneys*

*Counsel for the United States of America*

**INTEREST OF THE UNITED STATES**

The United States submits this statement under 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice "to attend to the interests of the United States" in any suit pending in federal court.  The United States enforces the federal antitrust laws, including the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, and has a strong interest in their correct application.  The Act imposes liability on "[e]very person" who violates its terms, 15 U.S.C. §§ 1, 2, and broadly defines the operative term "person" to include "corporations." 15 U.S.C. § 7.  The American National Red Cross ("ARC" or "Red Cross") is a tax-exempt "corporation" that carries out important charitable purposes, 36 U.S.C. §§ 300101–300111, and also operates a billion-plus dollar "blood-related business" through which it collects and sells blood and blood components in the United States.[1]  Because the ARC's argument that it is not subject to the Sherman Act rests on a misreading of the law, the United States urges the Court to reject this argument.  *See* ECF No. 19 at 9–11 (Red Cross's Mem. in Supp. of Mot. to Dismiss ("ARC Mot.")); ECF No. 27 at 1–10 (Red Cross's Reply in Supp. of Mot. to Dismiss ("ARC Reply")).  The United States takes no position on any other aspect of this case.

---

[1] American Red Cross Governance for the 21st Century at 1–2 (Oct. 2006), https://www.redcross.org/content/dam/redcross/atg/PDF_s/Governance/ BOGGovernanceReport.pdf; *see also* The American National Red Cross, Consolidated Financial Statements at 11–12 (June 30, 2021), https://www.redcross.org/content/dam/redcross/about-us/publications/2022-publications/FY21-RedCross-Audited-Financial-Statement.pdf (describing the Red Cross's blood-services business).

**ARGUMENT**

## THE ARC IS A "PERSON" SEPARATE FROM THE UNITED STATES ITSELF AND SUBJECT TO LIABILITY UNDER THE SHERMAN ACT

The Sherman Act broadly applies to "[e]very person" who violates its terms.  15 U.S.C. §§ 1, 2.  And the Act itself broadly defines the operative statutory term "person" to "include corporations and associations existing under or authorized by the laws of . . . the United States." 15 U.S.C. § 7 (emphasis added).  The Supreme Court has recognized that "corporate or governmental status in most instances is not a bar to the imposition of liability on an entity as a 'person' under the Act."  *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd*., 540 U.S. 736, 744–45 (2004).  As relevant here, the Court has repeatedly reaffirmed that non-profit corporations—like for-profit corporations—are subject to liability under the Sherman Act*.  See NCAA v. Alston*, 141 S. Ct. 2141, 2159 (2021); *NCAA v. Board of Regents*, 468 U.S. 85, 100 n.22 (1984) ("There is no doubt that the sweeping language of § 1 applies to nonprofit entities . . . ." (citing *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 786–87 (1975))).  While the Sherman Act's broad definition of "person" applies to all "corporations," the Supreme Court has held that "the United States itself" does not qualify as a "person" within the meaning of 15 U.S.C. § 7.  *Flamingo*, 540 U.S. at 745–46 (discussing *United States v. Cooper Corp.*, 312 U.S. 600, 614 (1941)); *see also Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 246 (D.C. Cir. 1981) (relying upon *Cooper* to "hold that the United States, its agencies and officials, remain outside the reach of the Sherman Act").

To determine whether the ARC is a "person" within the meaning of the Sherman Act, this Court must begin by closely examining the text and history of "the statutes that create and organize" the ARC.  *Flamingo*, 540 U.S. at 744.  Whether the ARC "should be treated under the antitrust laws as part of the Government of the United States" or as "a market participant

2

separate from it" turns on a highly context-specific examination of those statutes.  *Id.* at 747.  As

a result, the question before the Court is both narrow and specific to the ARC:  whether "in <u>both</u>

form <u>and</u> function" the ARC constitutes "a separate antitrust person from the United States."  *Id.*

at 748 (emphasis added).  For the reasons set forth below, the ARC is a corporate "person"

separate from the federal government and therefore subject to liability under the Sherman Act.

### A.  The ARC Meets the Statutory Definition of "Person" Under the Sherman Act

As an initial matter, the statutory "form" that Congress gave to the ARC—a

"corporation"—meets the statutory definition of "person" under the Sherman Act.  *See* 15 U.S.C.

§ 7.  For more than a century, "the statutes that create and organize" the ARC, *Flamingo*, 540

U.S. at 744, have provided that the ARC is a "corporation" that both "exist[s] under" and is

"authorized by the laws of . . . the United States."  36 U.S.C. § 300101(a); *see also* 36 U.S.C. §

300101(b) (setting forth "[t]he name of the corporation"); *id.* § 300101(c) ("Except as otherwise

provided, the corporation has perpetual existence."); *id.* § 300102 (enumerating "[t]he purposes

of the corporation"); *id.* § 300103 (setting forth rules concerning "membership in the

corporation" and "chapters of the corporation"); *id.* § 300104(a)(1) ("The board of governors is

the governing body of the corporation with all powers of governing and directing, and of

overseeing the management of the business and affairs of, the corporation."); *Rayzor v. United

States*, 937 F. Supp. 115, 119 n.2 (D.P.R. 1996) ("The Red Cross is a non-profit private

corporation created by an Act of Congress in 1905."), *aff'd*, 121 F.3d 695 (1st Cir. 1997).

"The fact that Congress grant[s] . . . a corporate charter does not render [an organization]

a Government agent."  *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S.

522, 543 (1987).  On the contrary, designating an entity a "corporation" is entirely "consistent

with the idea that it is an entity existing outside the Government."  *Flamingo*, 540 U.S. at 746;

*see also Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086–87 (2020) (describing the "bedrock principle[] of American law" that a corporation, whether public or private, is a "separate legal [entity] with distinct legal rights and obligations"). And because Congress established the ARC as a "corporation, the Court [must] ask whether the Sherman Act's definition [of "person"] extends to the legal entity," i.e., the ARC. *Flamingo*, 540 U.S. at 746. The Sherman Act defines the operative term "person" to include "corporations," 15 U.S.C. § 7, and that extends to the "corporation" at issue here—the ARC.

Federal courts have repeatedly concluded that—in contrast to other federal corporations, like the Federal Reserve Banks—the ARC is a corporate "person" separate from the United States itself. *See Hall v. Am. Nat'l Red Cross*, 86 F.3d 919, 922 (9th Cir. 1996) (ARC "cannot be considered a government actor" for purposes of the Religious Freedom Restoration Act and First Amendment); *Marcella v. Brandywine Hosp.*, 47 F.3d 618, 624 (3d Cir. 1995) (ARC is not "so deeply involved in the government" that it also enjoys immunity from trial by jury); *Irwin Mem'l Blood Bank of the S.F. Med. Soc'y v. American Nat'l Red Cross,* 640 F.2d 1051, 1057–58 (9th Cir. 1981) (ARC "is not a federal agency subject to the Freedom of Information Act"); *Rayzor*, 937 F. Supp. at 119 (ARC "is not a federal agency" for purposes of the Federal Tort Claims Act). As a corporate "person" distinct from the federal government, the ARC is subject to liability under the Sherman Act.

### B. The United States Does Not Control or Supervise the ARC's Operations, Employees, or Budget

The Supreme Court has made clear that this Court must determine whether "in <u>both</u> form <u>and</u> function" the ARC constitutes "a separate antitrust person from the United States." *Flamingo*, 540 U.S. at 748 (emphasis added). In determining whether as a functional matter an entity is part of the federal government, the Court has said that "[i]t is appropriate to begin the

analysis" by evaluating the entity's "corporate structure" to determine whether the federal government exercises sufficient control and supervision over the entity such that it can be deemed part of the federal government. *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 51 (2015); *see also Forsham v. Harris*, 445 U.S. 169, 180 n.11 (1980) ("Before characterizing an entity as 'federal' for some purpose, this Court has required a threshold showing of substantial federal supervision of the private activities."); *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629 (1983) (reaffirming that only where "a corporate entity is so extensively controlled by its owner" can a court conclude "that a relationship of principal and agent is created").

Because the United States does not own, control, or supervise the ARC, the ARC cannot "be treated under the antitrust laws as part of the Government of the United States." *Flamingo*, 540 U.S. at 747. In *Flamingo*, the Supreme Court began by analyzing the history and governing structure of the United States Postal Service. *See id.* at 739–41. In holding that the Postal Service was "part of the Government of the United States" for purposes of the federal antitrust laws, the Court highlighted that 9 of the 11 total members of its board of governors—all of whom are "officer[s] of the Government of the United States," 39 U.S.C. § 205(d)—are appointed by the President with advice and consent of the Senate. *Flamingo*, 540 U.S. at 740. Likewise, the Supreme Court's decision in *Department of Transportation v. Association of American Railroads*, that Amtrak qualified as a governmental entity, and not a private one, for purposes of determining the constitutional validity of regulations it promulgated, turned heavily on the fact that the President, with advice and consent of the Senate, could appoint 8 of the 9 total members of Amtrak's board. *Dep't of Transp.*, 575 U.S. at 53. This was essential to the Court's conclusion that Amtrak "is controlled by the Government." *Id.*; *see also Lebron v. Nat'l*

*R.R. Passenger Corp.*, 513 U.S. 374, 400 (1995) (holding that where the federal government

"retains for itself permanent authority to appoint a majority of the directors of [a congressionally-

created] corporation, the corporation is part of the Government").  The same is true for the

Federal Reserve, which is controlled by a board of governors each of whom is appointed by the

President and confirmed by the Senate, making it "an agency of the federal government . . . [that]

may not be sued under the Sherman Act." *Jet Courier Servs., Inc. v. Fed. Reserve Bank*, 713

F.2d 1221, 1228 (6th Cir. 1983).

      In this case, the ARC's board of governors—which is vested with "all powers of

governing and directing, and of overseeing the management and business affairs of, the

corporation"—is neither controlled nor supervised by the United States.  36 U.S.C.

§ 300104(a)(1).  The President does not enjoy the power to appoint <u>any</u> member of the ARC's

board of governors in the manner that the President is empowered to appoint the overwhelming

majority of the members of the boards of entities deemed "governmental," including the United

States Postal Service, Amtrak, and the Federal Reserve.  Instead, the ARC's statute provides that

"[t]<u>he board of governors</u>, in accordance with procedures provided in the [ARC's] bylaws, <u>shall</u>

<u>recommend</u> to the President an individual to serve as chairman of the board of governors."  36

U.S.C. § 300104(a)(3)(A) (emphasis added).  The President simply has the power to approve or

disapprove of the candidate recommended by the board.  *Id.*  The President has no authority to

appoint any of the other members of the ARC's board.  36 U.S.C. § 300104(a)(3)(B).  And

although before 2007 the President was authorized to appoint a total of 8 members of the ARC's

board—7 of whom were required to be "officials of departments and agencies of the United

States Government"—Congress eliminated that requirement in 2007 and reduced the number of

presidential appointees from 8 to 1 (the ARC board's recommended chair).  *See* American

National Red Cross Governance Modernization Act of 2007, Pub. L. No. 110-26, 121 Stat. 103, 104–05 (2007).[2]  Today no United States government officials serve on the ARC's board, which consists of the chairman, the ARC's President and CEO, and eleven corporate executives.[3]

Likewise, in contrast to entities that federal courts have deemed "governmental,"[4] the United States does not supervise the ARC's operations.  In 2007 Congress "explicitly delegate[d] to Red Cross management the responsibilities for day-to-day operations."  H.R. Rep No 110-87 at 7.  Congress made clear that the ARC's "board of governors is the governing body of the corporation with all powers of governing and directing, and of overseeing the management of the business and affairs of, the corporation."  36 U.S.C. § 300104(a)(1).[5]  And federal courts, including the Supreme Court, have long recognized that "government officials do not direct [the ARC's] everyday affairs."  *Dep't of Employment v. United States*, 385 U.S. 355, 360 (1966); *see also Hall*, 86 F.3d at 922 ("The daily affairs of the Red Cross are not controlled by government officials."); *Marcella*, 47 F.3d at 622 (finding that the ARC's "day-to-day activities are directed by the organization itself, not the government."); *Irwin*, 640 F.2d at 1057–58 (holding that the

---

[2] While U.S. government officials do serve on an "advisory council," 36 U.S.C. § 300104(d), Congress made clear it did "not confer any powers to the council."  H.R. Rep No 110-87 at 13.

[3] *See* Board of Governors, American Red Cross, https://www.redcross.org/about-us/who-we-are/leadership/board-of-governors.html.

[4] *See, e.g.*, *Flamingo*, 540 U.S. at 740-41 (explaining that the United States Postal Service is subject to statutorily mandated supervision with respect to postal rate changes and that its "decisions are in certain circumstances subject to judicial review"); *Dep't of Transp.*, 575 U.S. at 52 ("In addition to controlling Amtrak's stock and Board of Directors the political branches exercise substantial, statutorily mandated supervision over Amtrak's priorities and operations."); *Sea-Land*, 659 F.2d at 244 (holding that the Alaska Railroad is not subject to the Sherman Act on the grounds that it is "an entity wholly owned and operated by the United States," including because federal agencies and federal officials "supervise its operations").

[5] *See also* Amended and Restated Bylaws of the American National Red Cross at 2, 6 (Oct. 27, 2022), https://www.redcross.org/content/dam/redcross/about-us/who-we-are/governance/governance-documents/Amended-and-Restated-Bylaws.pdf (reaffirming that the "powers of governing and directing" are vested in ARC's board of governors).

ARC's "operations are not subject to substantial federal control or supervision"); *id.* at 1056 ("It is settled that government officials do not direct the everyday affairs of the Red Cross."); *Rayzor*, 937 F. Supp. at 119 ("[T]he daily affairs of the Red Cross are not controlled by the Government.").

Federal courts, including the Supreme Court, have also long recognized that the ARC's "employees are not employees of the United States." *Dep't of Employment*, 385 U.S. at 360; *see also Hall*, 86 F.3d at 923 ("Red Cross employees and volunteers are not employees of the federal government."); *Marcella*, 47 F.3d at 622; *Irwin*, 640 F.2d at 1056; *Rayzor*, 937 F. Supp. at 118 ("Red Cross employees and volunteers are not employees of the Federal Government."). And Congress has since 1956 made clear by statute that "[w]henever the President finds it necessary, he may accept the cooperation and assistance of the American National Red Cross," but, in doing so, "employees of the American National Red Cross may not be considered as employees of the United States." 10 U.S.C §§ 2602(a), (e). In contrast to employees of the United States, no employee of the ARC is required to take an oath of office and no ARC employee is subject to limitations on political activity or other regulations promulgated by the President for Executive Branch employees.

Nor is the ARC subject to the annual appropriations process entrusted to Congress and the President under the Constitution. While a federal government entity depends upon the President and Congress to "set and supervise its annual budget," *Dep't of Transp.*, 575 U.S. at 55, the ARC's own public website states that "the American Red Cross is not a federal agency, nor do we receive federal funding on a regular basis to carry out our services and programs."[6]

---

[6] Our Federal Charter, American Red Cross, https://www.redcross.org/about-us/who-we-are/history/federal-charter.html.

Instead, as the ARC explained in a report to Congress, "[a]s an independent 501(c)(3) nonprofit organization, the American Red Cross relies on the generosity of the American public to fulfill its mission," H.R. Rep No 110-87 at 23, as well as revenues from its blood business.[7]  Congress expressly provided for the ARC's independence from federal government control and supervision of its funding by making clear that "[t]he endowment fund of the corporation shall be kept and invested under the management and control of a board of trustees elected by the board of governors."  36 U.S.C § 300109 (emphasis added).

The ARC's independence from federal government control and supervision is reinforced by the limited oversight the federal government is authorized to exercise over the ARC and its operations.  Unlike other federal agencies, the ARC has argued—and a federal court has held— that the ARC is not subject to the Freedom of Information Act, 5 U.S.C § 552, because the ARC's "operations are not subject to substantial federal control or supervision."  *Irwin,* 640 F.2d at 1057.  Nor is the ARC required to maintain an independent inspector general pursuant to the Inspector General Act of 1978, Pub. L. No. 95-452, 92 Stat. 1101.  This stands in contrast to the Postal Service, which is subject to both the Freedom of Information Act and the independent oversight of the independent Postal Service Office of Inspector General.  *See* 39 U.S.C. § 410(b)(1) (specifying that the Postal Service is subject to FOIA); 5 U.S.C. § 415 (establishing the Postal Service Office of Inspector General); *see also Dep't of Transp.*, 575 U.S. at 52 (holding that Amtrak "is not an autonomous private enterprise," including because it has been subject to FOIA "every year of its existence" and it "must maintain an inspector general, much like

---

[7] The American National Red Cross Consolidated Financial Statements at 4 (June 30, 2021), https://www.redcross.org/content/dam/redcross/about-us/publications/2022-publications/FY21-RedCross-Audited-Financial-Statement.pdf (listing revenues from its "Biomedical Services" business).

governmental agencies such as the Federal Communications Commission and the Securities and

Exchange Commission"). Moreover, while the Comptroller General of the United States

generally enjoys broad oversight authority over federal government entities, Congress made clear

that the Comptroller General's authority to oversee the ARC is, consistent with its status as a

corporation that exists separate from the federal government, limited to a review of "the

corporation's involvement in any Federal program or activity the Government carries out under

law." 36 U.S.C § 300111.

### C. To Fulfill Its Statutory "Goals" and Role under the Geneva Conventions, the ARC Is and Must Remain Separate from the United States Itself

The Supreme Court has held that an entity's statutory "goals" and purpose are a relevant

indicator of the entity's legal status under the federal antitrust laws. *Flamingo*, 540 U.S. at 747.

In this case, the absence of requisite federal government control and supervision over the ARC

is, as federal courts have consistently concluded, necessary in light of the ARC's statutory

"goals" and founding purpose. *Id.* Congress designated the ARC to serve as the "national

society" that must "perform all the duties devolved on a national society" under the Geneva

Conventions. 36 U.S.C. §§ 300102(1), (2). To these ends, the ARC is required by statute to act

"as a medium of communication" between "the International Committee of the Red Cross and

the Government . . . of the United States." 36 U.S.C. § 300102(3). As the ARC itself has

argued, the corporation's statutory purpose is to serve as "the neutral body required by the

Geneva Conventions." Br. for Appellee Am. Nat'l Red Cross, *Hall*, 1996 WL 33486704, at *22

(9th Cir. Feb. 29, 1996). And, as the ARC itself has explained, "the terms of the Geneva

Conventions provide that the parties to the Conventions may authorize an autonomous and

independent national society to render assistance in the medical service of its armies." *Id.* (citing

the "Geneva Conventions," including Convention for the Amelioration of the Wounded, 22 Stat.

940 (1882); International Red Cross Convention, 35 Stat. 1885 (1907); Convention for the

Amelioration of the Condition of the Wounded, 47 Stat. 2074 (1932); Convention for the

Amelioration of the Condition of the Wounded, 6 U.S.T. 3114 (1955)).

In order to fulfill its role under the Geneva Conventions, the ARC must "[h]ave an

autonomous status" and "[b]e duly recognized by the legal government of its country on the

basis of the Geneva Conventions and the national legislation as . . . auxiliary to the public

authorities" of the United States.[8]  Consistent with this requirement, in 2007 Congress reaffirmed

that the ARC is a "volunteer organization" and "American charity" and made clear that the

changes it made to the text of the ARC's statute were designed to ensure that the ARC

maintained its independence from the federal government.  H.R. Rep No 110-87 at 7, 8.  In

particular, Congress reaffirmed that the 2007 legislation ensures the ARC's role is "consistent

with the relationship that national societies in other countries have to their governments as

autonomous auxiliaries to public authorities in each such country."  *Id.* at 13.  Consistent with

Congress's description of the ARC as an "autonomous auxiliar[y]" to the United States, federal

courts have repeatedly recognized that "[i]n order to fulfill its role under the Geneva Convention,

the Red Cross must be independent of the United States government."  *Hall*, 86 F.3d at 923; *see*

*also Marcella,* 47 F.3d at 624 ("[T]o properly fulfill its role as one of the participants in

international Red Cross activities and to enforce the provisions of the Geneva Convention, the

Red Cross must be independent of the United States government."); *Irwin,* 640 F.2d at 1057

(finding that in light of the "conditions necessary for recognition by the International Committee

---

[8] *See* Conditions for recognition of National Societies, Article 4, Statutes of the International Red
Cross and Red Crescent Movement (as amended 2006),
https://www.icrc.org/en/doc/assets/files/other/statutes-en-a5.pdf; *see also*
https://www.ifrc.org/sites/default/files/2021-08/IFRC_Guidance_A4_ENGLISH_WEB.pdf.

of the Red Cross" the ARC must "be viewed by the peoples of the world as an institution which owes its primary allegiance, not to any nation or group of nations, but to the alleviation of human suffering").

### D.  The ARC Lacks "Powers More Characteristic of Government"

The ARC's lack of "powers"—which the Supreme Court has held are a relevant indicator of an entity's legal status under the Sherman Act—further reinforce that the ARC cannot "be treated under the antitrust laws as part of the Government of the United States." *Flamingo*, 540 U.S. at 747.  Consistent with the ARC's status as an autonomous auxiliary to the United States, the ARC lacks "powers more characteristic of Government," including powers the Supreme Court has identified such as "state-conferred monopoly" and "the power of eminent domain." *Id.* While the United States Postal Service—pursuant to express statutory authority—"retains its monopoly over the carriage of letters, and the power to authorize postal inspectors to search for, seize, and forfeit mail matter transported in violation of the monopoly," *id.* at 741, Amtrak "preserve[s] passenger services and routes on our Nation's railroads," *Dep't of Transp.*, 575 U.S. at 46, and the Federal Reserve manages "the fiscal affairs of the federal government and the money supply of the nation," *Jet Courier*, 713 F.2d at 1228, the ARC retains no such governmental powers.

Instead, the ARC's blood business exercises powers consistent with those of private enterprise.  As the ARC has acknowledged, "the Red Cross' biomedical [blood] business is not addressed in the Charter"[9] and it operates in the market for blood and blood products as a private market participant.  *See* 36 U.S.C. §§ 300101–300111.  The Supreme Court has reaffirmed that

---

[9] *See* American Red Cross Governance for the 21st Century at 11 n.25 (Oct. 2006), https://www.redcross.org/content/dam/redcross/atg/PDF_s/Governance/BOGGovernanceReport.pdf.

"the power to set prices" is "the prototypical means of engaging in anti-competitive behavior." *Flamingo*, 540 U.S. at 747. And in contrast to the United States Postal Service—whose relevant pricing decisions are subject to detailed statutory instructions and must be made with consideration of the "mail-using public and o[f] competitors in the parcel delivery business," must be made with the participation of "a second independent establishment, the Postal Rate Commission," and can be "subject to judicial review," *id.* at 740–41—the statute chartering the ARC as a corporation imposes no constraints on its ability to set prices and, in this case, the Complaint (ECF 1) alleges that the ARC has the power to set prices at a supracompetitive level. *See* Compl. ¶ 220 ("[The Red Cross] can and does set the prices of its platelets above the competitive level."), ¶ 39 ("[The Red Cross] collects free donated platelets at its blood centers and then sells doses of platelets to hospitals at a profit."). In this work, the ARC's goals are the same as "those of private enterprise" because the ARC can—and has—generated revenues above costs. *Flamingo*, 540 U.S. at 747.[10] Further, in contrast to entities like the Federal Reserve, which must pay excess revenues into a "surplus fund" for use by the "United States Treasury," *Jet Courier*, 713 F.2d at 1228, and Amtrak, which must submit to "frequent [Congressional] oversight hearings into [its] budget, routes, and prices," *Dep't of Transp.*, 575 U.S. at 52, no such restrictions exist on ARC's use of its excess revenues.

For these reasons, the ARC cannot "be treated under the antitrust laws as part of the Government of the United States." *Flamingo*, 540 U.S. at 747.

---

[10] The American National Red Cross Consolidated Financial Statements at 4 (June 30, 2021), https://www.redcross.org/content/dam/redcross/about-us/publications/2022-publications/FY21-RedCross-Audited-Financial-Statement.pdf (listing approximately $50 million in operating revenues above expenses for the Red Cross's biomedical services division in fiscal year 2021).

**E. The ARC's Status as an "Instrumentality" for Tax Purposes Has No Bearing on Its Status as a "Person" Under the Sherman Act**

Contrary to the ARC's assertions, the fact that the ARC is a tax-exempt instrumentality has no bearing on its status as a "person" under the Sherman Act. Like many other corporations that are not themselves part of the federal government, the ARC is, as the ARC itself has put it, "an instrumentality of United States for the *limited purpose* of immunity from state taxation." Defs.' Corrected Mem. of Law in Support of their Mot. to Dismiss, *Mosseri v. Am. Red Cross*, No. 06-60192-CIV, 2006 WL 1863313, at *5 (S.D. Fla. May 23, 2006) (emphasis in original).

In 1966, the United States—together with the ARC—challenged an attempt by the State of Colorado to impose state unemployment taxes on the wages paid to Colorado-based employees of the ARC. Relying upon the Supreme Court's decision in *McCulloch v. Maryland,* 17 U.S. 316 (1819), the ARC (and the United States) argued that Colorado was barred from taxing the ARC and the Supreme Court held "that the Red Cross is an instrumentality of the United States for purposes of immunity from state taxation levied on its operations." *Dep't of Employment*, 385 U.S. at 356, 360.

When Congress amended the statute that created and organizes the ARC in 2007 to reduce the federal government's control and supervision of the ARC, Congress decided to "confirm that status." Pub. L. No. 110-26, § 2(a)(7), 121 Stat. 103, 104–05. In particular, Section 2 of The American National Red Cross Governance Modernization Act ("Modernization Act") states:

> "The United States Supreme Court held The American National Red Cross to be an instrumentality of the United States, and it is in the national interest that the Congressional Charter <u>confirm that status</u> and that any changes to the Congressional Charter do not affect the rights and obligations of The American National Red Cross to carry out its purposes."

*Id.* (emphasis added).

14

Accordingly, as the words of the Modernization Act itself make clear, in labeling the ARC an "instrumentality of the United States," Congress simply "confirm[ed]" the Supreme Court's holding that the ARC is "an instrumentality of the United States for purposes of immunity from state taxation levied on its operations." *Dep't of Employment*, 385 U.S. at 358. Congress did not, as the ARC asserts, designate the ARC "a federal instrumentality for all purposes." ARC Reply at 1, 4, 10. Instead, it simply codified what "[t]he Supreme Court of the United States held," Pub. L. No. 110-26, § 2(a)(7)—namely, that the ARC is only an "an instrumentality of the United States for purposes of immunity from state taxation levied on its operations." *Dep't of Employment*, 385 U.S. at 358.

This reading of the statute is further reinforced by the text of Section 2 of the Modernization Act, which clearly states that the 2007 "changes to the Congressional Charter do not affect the rights and obligations of The American National Red Cross to carry out its purposes." Pub. L. No. 110-26, § 2(a)(7). By reaffirming the Supreme Court's holding that the ARC is an "instrumentality" for purposes of immunity from state taxation levied on its operations, Congress did not alter the "rights and obligations" of the ARC, including its rights as a corporation to operate free from the constraints imposed on the government itself under the Religious Freedom Restoration Act, the Freedom of Information Act, and the Federal Tort Claims Act, which federal courts had held do not apply to the ARC. *See Hall*, 86 F.3d at 922–23; *Irwin*, 640 F.2d at 1057–58; *Rayzor*, 937 F. Supp. at 119–20; *see also* Br. for Appellees Am. Red Cross & Mary McCord, *Marie v. Am. Red Cross*, No. 13-4052, 2014 WL 671671, at *12, *37–45 (6th Cir. Feb. 11, 2014) (arguing that the Red Cross is not a "state actor" in the context of free speech, free exercise, equal protection, and procedural due process claims). Nor did the 2007 amendments alter the ARC's "obligations" to comply with the requirements of federal

15

statutes that apply to it as a "corporation," including the Federal Food, Drug, and Cosmetic Act ("FDCA"), which, like the Sherman Act, defines the term "person" to include a "corporation." 21 U.S.C. § 321(e).  Indeed, for more than 30 years, the ARC has been subject to lawsuits brought by the United States for violating the FDCA and other consumer protection laws.  For more than 22 years, the ARC was subject to a consent decree for violations of the FDCA and other federal statutes.  *See United States v. Am. Nat'l Red Cross*, No. 93-cv-0949, 1993 WL 186094 (D.D.C. May 12, 1993) (consent decree between the United States and the Red Cross for alleged violations of, *inter alia*, the Federal Food, Drug, and Cosmetic Act) (amended Apr. 15, 2003).  Pursuant to the terms of the consent decree, the United States imposed more than $47 million in fines on the ARC for violations of the consent decree and the law, including more than $10 million in fines that the United States imposed on the ARC in the months leading up to the enactment of the Modernization Act.[11]  In 2007 Congress reaffirmed that in confirming the ARC's status as an "instrumentality" for purposes of immunity from state taxation, it was not relieving the ARC of its "obligations" to comply with federal laws like other private market participants.

The ARC insists that it is not subject to the Sherman Act under *Flamingo* because it is an "instrumentality of the United States."  *See* Red Cross Mot. at 10–11 (quoting 36 U.S.C. § 300101(a)); Red Cross Reply at 1, 4, 10.  That is wrong.  *Flamingo* does not hold that a federal instrumentality *cannot* be a "person" under the Sherman Act.  In fact, the Court never even used

---

[11] *See, e.g.*, Andrew Bridges, *Red Cross Fined for Blood Safety Violations*, THE SPOKESMAN-REVIEW, Sept. 6, 2006, https://www.spokesman.com/stories/2006/sep/09/red-cross-fined-for-blood-safety-violations/; Adverse Determination Letter from Evelyn Bonnin, Director, Baltimore District, Food and Drug Administration, to John F. McGuire, President & CEO & Executive Vice President, Biomedical Services, American National Red Cross (Nov. 21, 2006), https://www.fda.gov/media/70245/download.

the term "instrumentality" in its opinion.  Instead, as discussed above, the Supreme Court in

*Flamingo* undertook a careful analysis of the statutes that create and organize the Postal

Service—including all of the factors which are relevant to determining government control and

supervision—and held that "[t]he Postal Service, in both form and function, is not a separate

antitrust person from the United States."  540 U.S. at 748.[12]

Moreover, as the Supreme Court has made clear, "[a]n instrumentality of the United

States can enjoy the benefits and immunities conferred by explicit statutes, however, without the

further inference that the instrumentality has all of the rights and privileges of the National

Government."  *Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821, 829 (1997).

Ultimately, the legal status of the ARC "'must be examined in light of its governmental role and

the wishes of Congress as expressed in relevant legislation.'"  *Id.* at 830 (quoting *Fed. Reserve*

*Bank of Bos. v. Comm'r of Corps. & Taxation of Commw. of Mass.*, 499 F.2d 60, 64 (1st Cir.

1974)); *see also Hall*, 86 F.3d at 921–23 (recognizing that entities "may be governmental

'instrumentalities' in some sense," but still "not a part of the government" and "explicitly

---

[12] The United States' position here is consistent with its position in *Flamingo*.  In *Flamingo*, the United States relied on the fact that the Postal Service was subject to extensive government control and was not chartered by Congress as a separate corporation in arguing that the Postal Service was not a separate antitrust "person" from the United States.  *See* Br. for the Petitioner, *Flamingo*, 2003 WL 21663261, at *13 (July 14, 2003) ("Congress did not [] establish the Postal Service as a corporation with a corporate charter or equity ownership interests."); *id.* at *13-16 (discussing extensive government control of the Postal Service); Reply Br. for the Petitioner, *Flamingo*, 2003 WL 22433931, at *6 (Oct. 21, 2003) ("Congress specifically rejected proposals to create the Postal Service as a government corporation . . . [instead] Congress created the Postal Service as part of the Government of the United States to be comprised of federal officers and employees who would carry forward this Nation's unbroken tradition of providing postal services as uniquely sovereign functions, regardless of profit." (internal quotes and citation omitted)).  And the United States explicitly recognized that some federal instrumentalities may be considered persons under the Sherman Act.  *See* Tr. of Oral Argument, *Flamingo*, 2003 WL 22938944, *4 (Dec. 1, 2003) ("The word instrumentality is used in a [] somewhat vague sense, elastic sense, and I think it would be necessary to look at the particular statute to see how much of a governmental character a particular entity has.").

reject[ing]" the argument that the ARC's instrumentality status for state-tax purposes "could be equated to the meaning of a government 'instrumentality' in other contexts").

## CONCLUSION

For the reasons set forth above, this Court should decline to dismiss the Complaint on the ground that the Red Cross is not subject to the Sherman Act.

Dated: August 4, 2023                    Respectfully submitted,

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

MAGGIE GOODLANDER
*Deputy Assistant Attorney General*

ANDREW J. FORMAN
*Deputy Assistant Attorney General*

ERIC D. DUNN
*Counsel to the Assistant Attorney General*

By:    /s/ ZACHARY D. CAPLAN
ZACHARY D. CAPLAN (PA Bar. No. 312522)
ERIC D. WELSH
ANDREW ROBINSON
JOSEPH ADAMSON
MELODY WANG
*Attorneys*

U.S. Department of Justice
Antitrust Division
950 Pennsylvania Ave NW
Washington, DC 20530
Telephone: (202) 706-3511
Email: zachary.caplan@usdoj.gov

*Counsel for the United States of America*

18

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, which was filed with the Court through the

CM/ECF system, will be sent electronically to all registered participants.


Dated: August 4, 2023                    /s/ ZACHARY D. CAPLAN
                                         ZACHARY D. CAPLAN